UNITED STATES of America, Plaintiff,

v.

Arthur James COOPER, Sr., and Timothy James Cooper, Defendants.

Crim. No. 87–73–JRR.

United States District Court, D. Delaware.

Feb. 4, 1988.

Charlene D. Davis, and Davis C. Weiss, Asst. U.S. Attys., U.S. Dept. of Justice, Wilmington, Del., for plaintiff.

Stephen B. Potter, of Potter, Carmine & Hodas, Wilmington, Del., for defendant Arthur James Cooper, Sr.

Joseph J. Longobardi, III, of Roeberg, Haase & Associates, Wilmington, Del., for defendant Timothy James Cooper.

## OPINION

ROTH, District Judge.

Arthur J. Cooper, Sr., has been indicted on 39 counts of wire fraud, in violation of 18 U.S.C. § 1343, and on one count of conspiracy in violation of 18 U.S.C. § 371. His son, Timothy J. Cooper, has been indicted on eight counts of wire fraud and one count of conspiracy.[1] The charges arise from Arthur Cooper's employment as a timekeeper at the Port of Wilmington. It is the responsibility of a timekeeper at the port to record for the stevedoring company, by which he is employed on any given day, the names, port numbers, pay rates and work hours of all longshoremen employed by that stevedoring company on that day.

The indictment in this case charges that on 67 occasions between September 10, 1984, and February 26, 1986, Arthur Cooper submitted to Southern Stevedoring Company daily timesheets which, along with the longshoremen listed, named Timothy Cooper as the timekeeper employed by Southern Stevedoring on that date. It is further charged that Timothy Cooper was a high school student at that time and that Arthur Cooper knew Timothy was not working for Southern Stevedoring on those days.

Timothy Cooper reached the age of 18 in November, 1985, and he is charged with wire fraud for seven occasions on which timesheets were submitted to Southern Stevedoring between November 4, 1985, and March 3, 1986.[2] Arthur and Timothy Cooper are also accused of conspiring to commit wire fraud.

There is no contention by the prosecution that the Southern Stevedoring timesheets in question were incomplete or not timely submitted. Moreover, under the collective

bargaining agreement between the Philadelphia Maritime Trade Association ("PMTA"), and the timekeepers' union, Local 1242–1 of the International Longshoreman's Association, AFL–CIO, a timekeeper is guaranteed eight hours pay for a normal working day on which he is hired, even though the time necessary to perform the required duties may take as little as 15 minutes.

Timothy Cooper received paychecks for the 67 dates listed in the indictment and filed income tax returns reflecting that income. Arthur Cooper was employed as a timekeeper on those days by one of the other two stevedoring companies then operating at the Port of Wilmington. Southern Stevedoring would have been obligated under the collective bargaining agreement to pay someone to be the timekeeper on those 67 days. For this reason, it suffered no monetary loss by having made the payments to Timothy Cooper. There is a question of fact whether it suffered a loss of services.

At the pretrial conference, the prosecution objected to defendants' instruction on the essential elements of wire fraud on the basis that defendants were requiring, on the authority of *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), that the two offenses, described in 18 U.S.C. § 1343, be conjoint rather than alternative.[3]

Section 1343 provides that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by

---

**1.** Gwynneth Cooper, wife of Arthur and mother of Timothy, was also indicted on 39 counts of wire fraud and one of conspiracy. Her attorney moved for acquittal at the close of the evidence offered by the Government and judgment of acquittal in her favor on all counts was granted at that time.

**2.** The "wire fraud" offense arises from the fact that it was the practice of Southern Stevedoring to transmit the payroll figures by telephone wire to corporate headquarters in Florida for

checking, recording and making deductions. The data was then retransmitted by wire to Wilmington for the issuing of the paychecks.

**3.** The mail fraud statute, 18 U.S.C. § 1341, and the wire fraud statute, § 1343, share the same language in relevant part and the Supreme Court has applied the same analysis to that language. *Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 320, n. 6, 98 L.Ed.2d 275 (1987).

means of wire, radio or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

The prosecution contends that § 1343 creates both the offense of devising a scheme or artifice to defraud and also the offense of devising a scheme or artifice for obtaining money or property by means of false or fraudulent pretenses, representations or promises. The prosecution then asserts that the *McNally* decision, requiring that a scheme to defraud be one to defraud of money or property, not of intangible rights, did not conversely create, in a scheme to obtain money by false representations, a requirement that a "victim" has suffered a loss of that money. Defendant Arthur Cooper, on the other hand, argues that the elements of the wire fraud offense in the present case are "(1) a scheme or plan to defraud of property or money, (2) to obtain by false pretenses and, (3) the use of the wire in furtherance thereof" and that defendants must have intended to cause a financial loss to Southern Stevedoring.

We are unable to accept defendants' reasoning. We acknowledge that traditionally fraud or a scheme to defraud has required that there be a reliance on the misrepresentation by the person defrauded to that person's loss or damage. *Id.* 107 S.Ct. at 2880–81. *See, e.g.,* Black's *Law Dictionary,* 5th Ed. ("fraud" and "defraud" defined). However, the wire fraud statute construed in *McNally,* was expressly written to cover not only schemes to defraud but also schemes that did not conform to the traditional elements of defrauding. *Id.* at 2879–80. The "obtaining by false pretenses" language was added to the mail fraud statute in 1909 to prohibit "false promises even if they did not qualify as 'fraud' at common law." *Id.* at 2889 (Stevens, J., dissenting). Therefore, the decision in *McNally*—that the "money or property" language of the second phrase of § 1341 and § 1343 defines the type of loss to be suffered in a first phrase "scheme to defraud"—does not transpose into a requirement that a second phrase "scheme to obtain money by false pretenses, representations, or promises" be hereafter construed as necessitating proof of all the elements of a common law scheme to defraud. To transform, into an "and", the "or" between "scheme to defraud" and "scheme to obtain money by false representations" would be to rewrite the clear language of the statute and to undercut the intended purpose of its second phrase. That purpose, as we have seen, is to prohibit schemes to obtain money or property by false or fraudulent representations under circumstances that don't fall within the traditional definitions of fraud.

The "obtaining money by false pretenses" language of the statute states clearly what is intended. Indeed, Senator Heyburn, the sponsor of the 1909 amendment which added that language, stated that it was "self-explanatory." *Id.* at 2880, n. 7 (quoting 42 Cong.Rec. 1026 (1908)). We find as well that these words are "self-explanatory" and should be interpreted as written—the obtaining by the misrepresentor, not the loss by the person defrauded, is the gist of the second phrase.

Moreover, the above reasoning is consistent with the Supreme Court's decision in *McNally.* The *McNally* case involved a scheme in which defendants, a state political party chairman, a state official and a private individual, arranged that Wombwell Insurance Company, which had been the state's agent to secure workmen's compensation coverage, would continue in that relationship in return for sharing its commissions for that work with other insurance agencies, including agencies in which the defendants had an ownership interest. The defendants were prosecuted for mail fraud and conspiracy. At trial, the court instructed the jurors that the scheme to defraud the citizens of Kentucky and its governmental departments, agencies, officials and employees of their rights to have that state's business and its affairs conducted honestly and to obtain money by false pretenses could be made out by either of two sets of findings, both based on a failure to make disclosures to state government per-

sonnel about defendants' ownership interest in insurance agencies sharing with Wombwell Insurance Co. in the commissions. The defendants were convicted on both charges. On appeal, the convictions were upheld. The Court of Appeals cited, as its basis for affirming the mail fraud convictions, a line of decisions holding that the statute proscribes schemes to defraud citizens of their intangible rights to honest and impartial government. *Id.* at 2879. The Supreme Court reversed on this point, holding that the "statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government." *Id.* The Supreme Court expressed its concern, that unless the statute was so restricted, it was not only vague but also overreaching in defining the prohibited conduct:

> Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 [and § 1343] as limited in scope to the protection of property rights.

*Id.* at 2881.

To support the above clarification of the statute, the Supreme Court overruled the earlier line of cases which held that the "money or property" language of phrase two did not limit a scheme to defraud under phrase one. However, the purpose of the Supreme Court in *McNally* to remove ambiguity from the statute does not necessitate a further narrowing of the statute, as urged by the defendants, to require that phrase two be read in the future to require that a scheme to obtain money by false pretenses qualify at the same time as a phrase one common law scheme to defraud.

It is interesting to note in *McNally* that the Government changed its position before the Supreme Court to assert that defendants had obtained property by means of false representations to Wombwell. *Id.* at 2882. The Supreme Court dismissed this argument, not because it made any finding that the argument was inherently defective, but because there was nothing in the jury charge that required such a finding. *Id.* The Supreme Court then held that the jury instruction, as actually given, permitted a conviction for conduct not within the reach of § 1341—for deprivation of citizens' intangible right to good government.

In *McNally*, Wombwell lost nothing. It received what it had agreed with defendants it would receive. If the *McNally* jury had had the opportunity to decide whether or not defendants had obtained money or property from Wombwell by means of false representations, the circumstances would appear to have been similar to the present case. The Government in *McNally* did not, however, prosecute that offense. The Supreme Court refused to permit that theory to be substituted on appeal to cure the defect in the case presented below.

In the case before us, the Government has made a proper and timely charge of obtaining money from Southern Stevedoring by means of false representations made to Southern Stevedoring. We find that this offense is described by the clear language of the statute. The offense charged here does not fall into ambiguous "outer boundaries" but consists precisely of what the statutory language prohibits: obtaining money by false representations.

As the scheme here is set out in the indictment, Arthur Cooper and his son, Timothy, could not have obtained the payments to Timothy Cooper from Southern Stevedoring without making false statements on the timesheets submitted to Southern Stevedoring. Defendants argue that someone was entitled to be paid as timekeeper for the days in question. This maybe so but, if Timothy Cooper did not do the work, he had no apparent right to be the person paid for it. To obtain the pay, he and/or his father had to make false representations to Southern Stevedoring. Because this type of conduct falls within the conduct proscribed by the language of phrase two of § 1343, a scheme or artifice "for obtaining money or property by means of false or fraudulent pretenses," we will adopt the jury instruction proposed by the

prosecution, rather than that of the defendants.