**UNITED STATES of America**

v.

**William (a/k/a "Cookie") THOMAS and Catherine Sheridan, Defendants.**

**Cr. Nos. 88–00044–01, 88–00044–02.**

United States District Court, M.D. Pennsylvania.

May 6, 1988.

Michael J. Eagen, Jr., William J. Hall, Scranton, Pa., for Catherine Sheridan.

Michael J. Barrasse, Robert J. Farrell, Scranton, Pa., for William Thomas.

James J. West, U.S. Atty., Malachy E. Mannion, Asst. U.S. Atty., Scranton, Pa., for the U.S.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Defendants were indicted by a federal grand jury on March 15, 1988. The indictment contains one (1) count charging conspiracy in violation of 18 U.S.C. § 371 and twenty (20) counts charging mail fraud in violation of 18 U.S.C. § 1341 as well as aiding and abetting in violation of 18 U.S.C. § 2. In short, the government alleges that in December of 1985, defendants, along with Thomas O'Hara, participated in a scheme to rig the examination process which had been prepared by the city of Scranton, Pennsylvania to produce a pool of candidates for the subsequent appointment of twenty (20) individuals to the position of Patrolman Grade I in the city's police department and used the mails in furtherance thereof. A one-count information alleging conspiracy in violation of 18 U.S.C. § 371 was filed against O'Hara on March 15, 1988, and he entered a guilty plea on March 24, 1988. It is anticipated that O'Hara will testify on behalf of the government in defendants' upcoming trial.

Presently before the court are defendants' motions to dismiss the indictment on the grounds, *inter alia,* that the government does not allege deprivation of a property interest as required by the mail fraud statute and that there is an insufficient nexus between the mailings referred to in the indictment and the objective of the purported conspiracy. For the reasons set forth below, the motions to dismiss the indictment will be denied.

## BACKGROUND

The government outlined its version of relevant events at a pretrial conference conducted in chambers on April 22, 1988.[1] Following defeat in his attempt for re-election as mayor of the city of Scranton in November of 1985, James Barrett McNulty directed Thomas O'Hara, then chairman of the city's civil service commission, to prepare entry level and promotional tests for the police and fire departments (tr. at 41–42). Twenty (20) vacancies existed in the police department (tr. at 43). The twenty (20) individuals appointed to those vacancies would assume the position of Patrolman Grade I and would replace reserve patrolmen who were paid a flat hourly fee, with no benefits or guaranteed hours (tr. at 38).

The police entry level examination was prepared by O'Hara and defendant Sheridan (tr. at 47). According to the indictment, the latter functioned as a secretary to the mayor and as chief examiner for the civil service commission. O'Hara and Sheridan also publicized the examination and distributed applications by mail and in person (tr. at 44–46). Three hundred and eighty-eight (388) persons applied to take the test (tr. 45–46).

Sometime prior to the administration of the police entry level examination, defendant Thomas approached O'Hara and requested the answer key for circulation among a select group of the reserve patrol-men (tr. at 47). Thomas expressed consternation that these reserve patrolmen might lose their employment and suffer financial distress (tr. at 47). Thomas had previously solicited contributions from the reserve patrolmen for the re-election campaign of Mr. McNulty (tr. at 37–41).

O'Hara agreed to accommodate Thomas' request but inadvertently extracted the wrong answer key from a file cabinet in the civil service commission's office (tr. at 49). Specifically, O'Hara pulled out an answer key from a previous police entry level examination which had been scheduled in 1984 but which had never been administered (tr. at 47, 49). O'Hara made a copy of the outdated answer key and placed it in an envelope marked "Cookie Thomas" which was delivered to Thomas through interoffice mail (tr. at 49). Thomas met individually with reserve patrolmen in a back office in police headquarters and disclosed the examination answers which he had received (tr. at 50).

Meanwhile, Sheridan obtained a copy of the appropriate answer key from the file in the civil service commission's office and gave it to a city official, at his request, apparently for distribution to certain reserve patrolmen (tr. at 51–52). Some of the reserve patrolmen eventually received both the incorrect and the correct answer keys and discarded the latter in favor of the former (tr. at 52).

The police entry level examination was administered by O'Hara and Sheridan on Saturday, December 7, 1985 at Central High School in Scranton (tr. at 53). Some of those individuals who had been supplied with the wrong answer key recognized the discrepancy during the examination and later telephoned Thomas at his home to complain (tr. at 53–54). Thomas immediately went to Central High School, advised O'Hara that O'Hara had turned over the wrong answer key and stated, "You've got

1. The government's complete version of events can be found in the transcript of the pretrial conference. *See* document 40 in M.D.Pa.Cr. No. 88–00044–01. All citations to the transcript will be indicated by parenthetical references in the text.

The court sets forth the government's accusations at length for the purpose of addressing defendants' motions to dismiss the indictment and, by doing so, does not accept those accusations as true, since such a determination is properly left for consideration by a jury.

to take care of these guys, the guys that I gave it out to." Thomas added that he would inform O'Hara of the identities of these individuals (tr. at 53–54, 59). O'Hara agreed to attempt to remedy his mistake, and he informed Sheridan that he had given out the wrong exam answers and now had to correct that error (tr. at 55). Sheridan responded that O'Hara was crazy and that she never would have done that although, according to the government, she had already distributed a set of answers herself (tr. at 55).

Over the weekend, Thomas met with almost all of those to whom he had given the wrong answer key and told them not to worry because the situation would be taken care of (tr. at 56). When O'Hara arrived at his office on the following Monday, he found an envelope on his desk containing a list of the names of the individuals whom Thomas wanted "to take care of" (tr. at 57).[2] O'Hara and Sheridan then secluded themselves in the mayor's conference room in order to correct all of the test answer sheets, and O'Hara informed Sheridan of the existence and purpose of the list of names which he had received from Thomas (tr. at 58–59). He gave her the list and she read the names from the list as he extracted the answer sheets of those persons from the pile of answer sheets (tr. at 59). O'Hara then composed new answer sheets for these individuals in order to qualify them for the next step, viz., an oral examination to be conducted by O'Hara and Sheridan (tr. at 59–61). When he finished and was leaving the room without the original answer sheets of those named on the list, Sheridan advised him to make sure he destroyed the answer sheets which he had extracted (tr. at 63–64). O'Hara threw away the original test answers of those named on the list, along with the list of names itself, in a wastebasket at city hall (tr. at 64).

All applicants who scored seventy (70) or better on the written police entry level examination became eligible for a subsequent oral examination (tr. at 67). Sheridan pre-

pared a form notification for those applicants who scored seventy (70) or better, informing them to report for an oral examination (tr. at 68). O'Hara stuffed the envelopes, and Sheridan delivered them to the mail room at city hall for mailing (tr. at 68). The mailings to the twenty (20) individuals referred to in counts II through XXI of the indictment form the basis of the government's mail fraud charges.

O'Hara and Sheridan conducted the oral examinations and thereafter compiled and furnished to Mr. McNulty a list of finalists in order of their grades, which were a composite of each candidate's written test score (60%) and oral examination score (40%) (tr. at 64–65, 70). At Mr. McNulty's direction, the top twenty (20) candidates were offered the position of Patrolman Grade I (tr. at 70). Nineteen (19) of these twenty (20) accepted the position, while the remaining individual declined the position in order to accept an appointment to the fire department; the candidate who was twenty-first (21st) on the list of finalists subsequently was offered and accepted the last position of Patrolman Grade I (tr. at 70–71). The twenty (20) individuals referred to in counts II through XXI of the indictment are those who received the Patrolman Grade I appointments. Of those candidates whose examination papers O'Hara remembers altering, with one exception, all ended up in the top twenty (20) on the list of finalists (tr. at 65).

In response to the government's allegations, defendant Sheridan filed a motion to dismiss the indictment and a brief in support thereof on April 22, 1988. See documents 16 and 18 in M.D.Pa.Cr. No. 88–00044-02, respectively. Defendant Thomas also submitted a motion to dismiss the indictment and a supporting brief on the same date. See documents 19 and 25 in 88–00044-01, respectively. Defendants in essence maintain that:

(1) the indictment fails to allege a deprivation of property as required under the mail fraud statute, 18 U.S.C. § 1341;

2. The government is unaware of both the total number of names on the list and the identity of some of the individuals named on the list (tr. at 65).

(2) the indictment fails to allege any mailing with a sufficient nexus to the objective of the purported conspiracy since said objective was accomplished prior to the mailings referred to in the indictment;

(3) the mailings referred to in the indictment were required by law, thus insulating defendants from criminal liability for these mailings;

(4) the indictment is duplicious inasmuch as the government incorporates all of the allegations from count I, the conspiracy count, into counts II through XXI, the mail fraud counts;

(5) the indictment improperly joins the two defendants in violation of Fed.R. Crim.P. 8(b) since the government fails to allege any activity or conspiracy common to both; and

(6) insufficient evidence was presented to the grand jury to permit it to indict.

The government filed briefs in opposition to defendants' motions to dismiss the indictment on May 4, 1988. *See* document 58 in 88–00044–01 and document 35 in 88–00044–02. Trial is scheduled to commence May 9, 1988.

Defendants' motions to dismiss the indictment are now ripe for disposition.

### DISCUSSION

*I. Property Interest*

The mail fraud statute, 18 U.S.C. § 1341, provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository

for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

It is without question following the United States Supreme Court's decision in *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), that the mail fraud statute is limited in scope to the protection of property rights and does not prohibit schemes to defraud citizens of their intangible rights to honest and impartial government. In the present case, the government avers four (4) property rights which were allegedly infringed by defendants' activities:

(1) the unsuccessful applicants' chance to receive an appointment as Patrolman Grade I, together with associated tangible property in the form of salaries and benefits;

(2) the city of Scranton's answer keys which were allegedly removed from the file cabinet in the civil service commission's office, thereby also depriving the city of Scranton of its intangible property right to the confidentiality of those answers;

(3) the test answer sheets which were altered and destroyed on Monday, December 9, 1985, thereby further depriving the city of Scranton of its intangible right to a civil service list complying with the law and reflecting true and accurate test scores; and

(4) tangible property in the form of salaries and benefits paid by the city of Scranton to police officers who had not legally qualified for the position of Patrolman Grade I.

*See* indictment at ¶ 5(a)-(d).

This court holds that the examination answer keys which were allegedly removed from the file cabinet in the civil

service commission's office and the test answer sheets which were allegedly altered and destroyed clearly constitute property of the city of Scranton, confidential in nature, within the protection of the mail fraud statute. *See Carpenter v. United States,* — U.S. —, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (newspaper had property right in confidential business information prior to its publication, and newspaper reporter and others who participated in an insider trading scheme based upon their misappropriation of that information defrauded the newspaper within the meaning of the mail fraud statute); and *United States v. Doherty,* 675 F.Supp. 726 (D.Mass.1987) (where defendants were charged with conspiracy to commit mail fraud for illegally obtaining, selling and buying police entrance and promotional examinations, court held that the examinations themselves were property of the Commonwealth of Massachusetts possessing intrinsic value).

Defense counsel apparently argue that the property interests described in paragraphs (2) and (3) above essentially amount to a charge of deprivation of honest government in contravention of the Supreme Court's *McNally* decision. *See, e.g.,* document 18 in 88–00044–02 at 13 and document 25 in 88–00044–01 at 6. The court rejects this contention. The right to honest and impartial government is an ethereal expectation, shared by all citizens, without intrinsic value. In contrast, the examination answer keys that were allegedly removed from the civil service commission's file cabinet as well as the test answer sheets that were purportedly altered and destroyed were tangible pieces of property belonging to the city of Scranton which contained confidential information of critical importance to allow the city to determine the most qualified candidates for the twenty (20) available positions as Patrolman Grade I.[3] This court simply cannot equate, in a property rights context, actual answer keys and candidates' written responses for entry level police examinations with the general right to good government which was rejected in *McNally.*

Counsel for defendant Thomas also maintain that, like the confidential business information in *Carpenter,* the answers to police entry level examinations are no longer property of the city once they are released to the public. Defense counsel then reason that the answers provided to Thomas were not property of the city of Scranton since they were in reality the answers to a previous test. *See* document 25 in 88–00044–01 at 6–7. Defense counsel have failed to demonstrate, however, that the veil of confidentiality was ever removed from the questions or answers from the police entry level examination which had been scheduled for 1984 but which had never been administered. In fact, the government indicated at the pretrial conference that in preparing the 1985 police entry level test, O'Hara and Sheridan extracted questions and answers from the unused 1984 examination (tr. at 47). Thus, although Thomas did not receive the set of answers that he wanted, he nonetheless obtained—if the government's accusations are true—confidential property of the city of Scranton. Although the answer key which he acquired may have been nothing more than "a sheet with numbers and letters, a meaningless jumble" to him, *see* document 25 in 88–00044–01 at 5, the answer key had much greater significance to the city of Scranton from whose perspective the property right is adjudged.

■ Whether the payment of salaries and benefits to the twenty (20) individuals appointed to the position of Patrolman Grade I constitutes a deprivation of property presents a more complicated question. In *Ingber v. Enzor,* 664 F.Supp. 814 (S.D.N.Y.1987), *aff'd,* 841 F.2d 450, 56 U.S.L.W. 2539 (2d Cir.1988), the district court vacat-

---

**3.** The Court in *Carpenter* cautioned, *"McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." 108 S.Ct. at 320. "The Journal's business information that it intended to be kept confidential was its property." *Id.* at 321–22. The instant case involves tangible property, *i.e.,* the physical answer keys and candidates' test responses, which embodies property intangible in nature, *i.e.,* the confidential information contained in those answer keys and test responses.

ed the conviction of a town supervisor for violating the mail fraud statute by falsifying, *inter alia,* absentee ballots in connection with his election. At trial, the court had instructed the jury that it could find fraud in either a deprivation of the public's right to honest elections or in the taking of the town supervisor's salary. In its later opinion, the district court ruled that the instruction regarding the public's right to honest elections was improper in light of the subsequent *McNally* decision. The court added that "payment of the Supervisor's salary, a routine and budgeted town expenditure, to Ingber rather than to his opponent ... does not constitute a loss of money or property as contemplated by *McNally* and the mail fraud statute." 664 F.Supp. at 821. The court reasoned that "the salary of the office of Town Supervisor would have been paid to *some* victorious candidate, regardless of Ingber's attempt to control the outcome of the election" (emphasis in original). *Id.* at 822.[4]

The court in *United States v. Cooper,* 677 F.Supp. 778 (D.Del.1988), followed a different approach. There, the defendant was charged with wire fraud for false submissions of timesheets to a stevedore company, stating that his son, not himself, had served as timekeeper for the stevedore company and was entitled to the compensa-

tion, when the defendant/father had actually performed the work. The defendant argued that the stevedore company did not suffer any financial loss since the stevedore company would have been required to pay someone for the same timekeeping services provided by him. The court rejected the defendant's argument, finding that his conduct fell within the clear language of the wire fraud statute, 18 U.S.C. § 1343, which proscribes a scheme or artifice "for obtaining money or property by means of false or fraudulent pretenses" without any reference to financial loss on the part of the victim. The relevant language of the mail fraud statute, 18 U.S.C. § 1341, is identical.[5]

In the interim between the *Ingber* and *Cooper* decisions, the Supreme Court in *Carpenter v. United States, supra,* unanimously rejected the defendants' contention that a scheme to defraud under the mail fraud statute requires a monetary loss for the victim.[6] The Court found that it was sufficient that the newspaper was deprived of the exclusive use of its confidential business information, even though the newspaper suffered no financial detriment as a result of the defendants' activities. *See Carpenter,* 108 S.Ct. at 321.

In the present case, defense counsel apparently contend that the mail fraud stat-

---

4. In affirming the district court's opinion, the Second Circuit made no reference to the statements quoted above. The Second Circuit summarized its holding as follows:

> Where there is doubt as to whether a conviction is predicated on an impermissible ground, that doubt must be resolved in the defendant's favor and the conviction vacated (citation omitted). The jury in this case was charged in the alternative; one of the theories of guilt w15as based on a right to free and fair elections, impermissible in light of *McNally.* Since the jury was instructed to return a general verdict, [the district court] correctly concluded that doubt existed concerning the grounds for the jury's decision.

5. The *Cooper* court made the following pertinent observation regarding the *McNally* decision:

> It is interesting to note in *McNally* that the government changed its position before the Supreme Court to assert that defendants had obtained property by means of false representations to Wombwell (citation omitted). The

Supreme Court dismissed this argument, not because it made any finding that the argument was inherently defective, but because there was nothing in the jury charge that required such a finding (citation omitted). The Supreme Court then held that the jury instruction, as actually given, permitted a conviction for conduct not within the reach of § 1341—for deprivation of citizens' intangible right to good government.

> In *McNally,* Wombwell lost nothing. It received what it had agreed with defendants it would receive. If the *McNally* jury had had the opportunity to decide whether or not defendants had obtained money or property from Wombwell by means of false representations, the circumstances would appear to have been similar to the present case. The government in *McNally* did not, however, prosecute that offense. The Supreme Court refused to permit that theory to be substituted on appeal to cure the defect in the case presented below.

677 F.Supp. at 781.

6. The *Cooper* court made no reference to the *Carpenter* decision.

ute is inapplicable because the city of Scranton suffered no financial detriment as a result of defendants' alleged actions—the city would have paid the same Patrolman Grade I salaries and benefits in any event—especially since the experienced reserve patrolmen who were appointed to the position of Patrolman Grade I were qualified for that job. *See, e.g.,* document 18 in 88–00044–02 at 14–16 and document 25 in 88–00044–01 at 4–5. The *Carpenter* decision, supported by the *Cooper* opinion, presents the controlling law and the better-reasoned approach, *i.e.,* that the clear language of the mail fraud statute does not require a net monetary loss incurred by the city of Scranton in order to find that the city was fraudulently deprived of its property. Moreover, whether the reserve patrolmen who were appointed to the position of Patrolman Grade I were the most qualified persons for that position is a question properly answered through honest and accurate examination procedures, not by defense counsel.

█ Finally, the court agrees with defense counsel that the unsuccessful candidates' chance of receiving an appointment as Patrolman Grade I does not amount to a property interest. In *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, the Supreme Court remarked, "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *See also Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Bigby v. City of Chicago,* 766 F.2d 1053 (7th Cir. 1985); and *Robb v. City of Philadelphia,* 733 F.2d 286 (3d Cir.1984).[7] The court finds the main case relied upon by the government on this issue, *Stana v. School Dist. of City of Pittsburgh,* 775 F.2d 122 (3d Cir.1985), to be inapplicable to the facts at hand. In *Stana,* the Third Circuit ruled that a school district's established policy provided a teacher with a property right to

*remain* on an eligibility list which in effect resembles the list of finalists compiled by defendant Sheridan and Thomas O'Hara. If the government's accusations of fraud in the present case are true, there is no way of determining which applicants for the police department would have composed the eventual list of finalists. The court simply finds nothing in the record giving all of the unsuccessful candidates more than a unilateral expectation of *making* the list of finalists. Therefore, the court concludes that the unsuccessful candidates' chance of employment cannot serve as a property interest under the mail fraud statute.

## II. The Mailings

█ Defendants maintain that there is an insufficient nexus between the mailings referred to in the indictment (*viz.,* the notifications to the twenty (20) individuals who eventually received appointments as Patrolman Grade I to report for an oral examination on the basis of their written test scores) and the objective of the purported conspiracy. They argue:

It is basic that for a mailing to come within the Federal Mail Fraud Statute, the mailing must be for the purpose of executing the scheme. The scheme outlined in the indictment and sentencing colloquy [of Thomas O'Hara] was to secure higher grades for the favored individuals on the written part of the Civil Service Exam for Patrolman 1. The members of the favored class received the higher grades before any mailing took place.

If the fraud contemplated by the scheme had already been completed, here a higher mark in the written exam, then a subsequent mailing cannot be used to bring the alleged fraud within the ambit of the Federal Mail Fraud Statute.

*See* document 25 in 88–00044–01 at 13. *See also* document 18 in 88–00044–01 at 9 ("the scheme was completed, it had reached fruition, those who were to receive higher

---

7. These cases analyze property interests in a due process context. In the absence of evidence of Congressional intent, this court will examine

property interests for purposes of the mail fraud statute from the same constitutional perspective.

marks on the written exam had already received them at the time the mailings took place"). In support of their contention, defendants cite the decisions in *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed. 2d 1277 (1960); *Kann v. United States,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); and *United States v. Tarnopol,* 561 F.2d 466 (3d Cir.1977).

Under the mail fraud statute, the mailing must be " 'for the purpose of executing' a scheme to defraud or attempting so to do." *Tarnopol,* 561 F.2d at 471. *See also Kann,* 323 U.S. at 94, 65 S.Ct. at 151. "The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Kann,* 323 U.S. at 95, 65 S.Ct. at 151. "Thus the gist of the crime is the use of the mails for the purpose of executing a scheme to defraud. It is not every fraudulent scheme which is comprehended by the mail fraud statute but only those in which the mails are used." *Tarnopol,* 561 F.2d at 471.

"It is not necessary that the scheme contemplate the use of the mails as an essential element." *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). The use of the mails must be "incident to an essential part of the scheme." *Id.* "It is sufficient if the mailing furthers the scheme or is incident to an essential part of it." *United States v. Otto,* 742 F.2d 104, 108 (3d Cir.1984). Moreover, one "causes" the mails to be used "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business or where such use can reasonably be foreseen, even though not actually intended." *Pereira,* 347 U.S. at 8–9, 74 S.Ct. at 362–63; *United States v. Sturm,* 671 F.2d 749, 751 (3d Cir.1982).

To bring a defendant's conduct within the ambit of the mail fraud statute, it must be proved that the "mailings were sufficiently closely related to [the] scheme,"

*Maze,* 414 U.S. at 399, 94 S.Ct. at 648, and that the scheme's completion depended in some way on the alleged mailings. *United States v. Brown,* 583 F.2d 659, 664 (3d Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). *See also Otto,* 742 F.2d at 108. The close relation between the mailings and the scheme does not focus on time or space but on the interplay between the completion of the scheme or the prevention of its detection and the mailings. *Tarnopol,* 561 F.2d at 472. Consequently, mailings occurring after the object of the scheme has been accomplished, or before its accomplishment has begun, do not have a sufficient nexus to the scheme to support a mail fraud prosecution. *Id.*

In the present case, defendants' narrow definition of the objective of the purported conspiracy is unpersuasive and unacceptable. Surely, if the government's factual allegations are true, obtaining higher written examination grades for favored individuals was not an end in itself; rather, the immediate purpose of the conspiracy was to render the favored individuals eligible for an oral examination, while its ultimate goal was to acquire for them the position of Patrolman Grade I, and each end was furthered by the mailing of the notifications for an oral exam. In short, defendants' definition of the conspiracy's objective is artificially constricted.

The three Supreme Court cases cited by defendants are distinguishable because, in all of these cases, the defendants had completely obtained the fruits of their schemes prior to the mailings in question. In *Maze,* the defendant had used a stolen credit card to obtain lodging at motels, and the Court held that the scheme reached fruition when the defendant checked out of the motels and did not depend upon the subsequent mailing of his sales slips by the motels or upon who bore the loss. Similar reasoning was utilized in *Kann* (defendants fraudulently obtained checks payable to them which were cashed or deposited at a bank and then mailed for collection to the drawee bank after defendants had obtained the money) and *Parr* (defendants obtained gasoline by unauthorized use of a credit

card issued by their employer/school district, and the gasoline company later mailed invoices to the school district). In *Tarnopol*, the Third Circuit specifically noted that the mailings in question occurred prior to the commencement of the execution of the scheme. *Tarnopol*, 561 F.2d at 473. Moreover, it is evident from a reading of each of the cases cited by defendants that the respective schemes therein may have been better served if none of the mailings had ever taken place.

This court finds the *Carpenter* opinion more applicable to the present facts. In *Carpenter*, the procurement of the Wall Street Journal's confidential information was not the ultimate objective of the defendants' scheme; rather, it was a necessary step in achieving their overriding goal, *i.e.*, profits derived from insider trading which, in turn, depended upon the mailing of the Wall Street Journal by others. So too, in the instant case, the altering of favored individuals' written test responses was a necessary step toward the ultimate purpose of the alleged conspiracy, which depended upon the mailed oral examination notices for its progression and eventual completion. *See also Doherty*, 675 F.Supp. at 731 ("the purchase of the [police] examinations [w]as the first step in the defendants' scheme to defraud the Commonwealth of ... periodic salary payments").

Therefore, this court concludes that the mailings referred to in the indictment are sufficiently related to the ultimate objective of defendants' purported scheme to render the mail fraud statute applicable in this case.

■ Relying upon the Supreme Court's decision in *Parr*, defendants also assert that they cannot be held criminally liable for their alleged conduct because the mailings in question were required by law. In *Parr*, the school board "was required by the state law to use the mails" to collect taxes. 363 U.S. at 388, 80 S.Ct. at 1182. The Court noted that the factual situation before it was "unique" in that the relevant mailings were required by law. *Id.* at 391, 80 S.Ct. at 1183. The Court went on to hold that the legally compelled mailings could not support the mail fraud charges. The Court also substantially relied upon the fact that the indictment did not allege that these mailings were part of the offense.

In the case at hand, Rule IX of the Rules and Classifications of the Municipal Civil Service Commission of Scranton, Pennsylvania states, "The Secretary, as early as practicable after the completion of an examination, shall *notify* each candidate therein of the rating he has received ..." (emphasis supplied). The court does not read this language as legally mandating use of the mails. In fact, the government indicated at the pretrial conference that for past examinations, at least some of the candidates were notified of the results by telephone (tr. at 12). Thus, the court finds that defendants' reliance upon *Parr* is misplaced, that the mailings in question were not legally compelled and that defendants are not insulated from criminal liability.

## III. Remaining Contentions

Defendant Sheridan argues, "The indictment in the present case fails to state any activity common to both Catherine Sheridan and defendant Thomas, neither do the allegations contained in the indictment set forth a conspiracy with defendant Thomas." *See* document 18 in 88–00044–01 at 4. In other words, Sheridan reads the indictment as setting forth a conspiracy between Thomas and O'Hara separate and distinct from a conspiracy between O'Hara and herself.

■ The essence of conspiracy is an agreement, tacit or express, for an unlawful purpose between two or more persons, and it is not required that the conspirators join in at least one overt act common to all of them. *United States v. Heldon*, 479 F.Supp. 316, 321 (E.D.Pa.1979). " 'The fact that a conspirator is not present at, or does not participate in, all of the conspiratorial activities does not, by itself, exonerate him.... (I)t is not necessary for each conspirator to have entered into the unlawful agreement at its inception.' " *Id.* at 321 (quoting *United States v. Ashley*, 555 F.2d 462, 467 (5th Cir.1977)). "[I]t is not neces-

sary for each co-conspirator even to agree to or actually participate in every step of the conspiracy.... A co-conspirator need not be, and often is not, aware of everything being done to further the conspiracy." *United States v. Spudic,* 795 F.2d 1334, 1337 (7th Cir.1986). "A person may participate in a conspiracy without knowing the identities of all of the other co-conspirators." *United States v. Capo;* 791 F.2d 1054, 1066 (2d Cir.1986). Finally, a co-conspirator is bound by the overt acts of other conspirators taken in furtherance of the conspiracy, whether or not said co-conspirator was a member of the conspiracy at the time, and in a mail fraud case, when one conspirator causes the mailings, this act can be imputed to all the members of the conspiracy. *United States v. Bloom,* 78 F.R.D. 591, 607 (E.D.Pa.1977).

 In the present case, if the government's accusations are true, defendant Thomas and Thomas O'Hara formed a conspiracy for the purpose of fraudulently obtaining the position of Patrolman Grade I for certain favored individuals. Sheridan was informed of the existence and purpose of the conspiracy by O'Hara on Saturday, December 7, 1985 at Central High School and again on Monday, December 9, 1985 in the mayor's conference room. Her decision to participate in the conspiracy is allegedly evidenced by (1) her reading of the list of names to O'Hara so that he could separate and alter the test responses of those named on the list from the responses of the remaining candidates, and (2) her advising O'Hara to take and destroy the original responses of those named on the list. According to the government's averments, the conspiracy originally formed between O'Hara and Thomas remained a continuing enterprise and did not convert into a different enterprise when a third person, Sheridan, became involved. Having carefully reviewed the indictment, the court finds that it does not, as asserted by defense counsel, aver separate conspiracies between O'Hara and Thomas and between O'Hara and Sheridan but rather alleges one ongoing conspiracy among these three persons with a constant goal. Thus, defendant Sheridan has not been improperly joined with defendant Thomas.

 The mere incorporation by reference of a conspiracy count into a substantive count does not constitute multiplicity. *United States v. Serino,* 835 F.2d 924, 930 (1st Cir.1987) (conspiracy and mail fraud counts); *United States v. Kirby,* 587 F.2d 876, 882 (7th Cir.1978) (conspiracy and mail fraud counts). In addition, the test for determining whether counts of an indictment are truly separate, and not multiplicious, is whether proof of one offense charged requires an additional fact that proof of the other offense does not necessitate. *United States v. Carter,* 576 F.2d 1061, 1064 (3d Cir.1978). In addition to the incorporated paragraphs, counts II through XXI of the indictment contain a different allegation of fact that is required to be proven for a mail fraud conviction, *i.e.,* that the respective mailing was made to execute the scheme. The court, then, concludes that counts II through XXI in the indictment are not multiplicious.

Lastly, once a grand jury returns an indictment valid on its face, a district court will not make an independent inquiry of the evidence considered by the grand jury. *United States v. Helstoski,* 576 F.2d 511 (3d Cir.1978), *aff'd,* 442 U.S. 477, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979); *United States v. Basurto,* 497 F.2d 781 (9th Cir.1974); and *United States v. Shober,* 489 F.Supp. 393 (E.D.Pa.1979). In any event, it is readily apparent from the statements made by Thomas O'Hara during his guilty plea and from the representations made by the government during the pretrial conference that there are ample grounds to support the indictment against defendants. *See* document 9 in M.D.Pa.Cr. No. 88–00047 (transcript of O'Hara plea) and document 40 in 88–00044–01 (transcript of pretrial conference). *See also United States v. Short,* 671 F.2d 178, 183 (6th Cir.), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982) (grand jury utilizes probable cause standard in determining whether to issue indictment).

For the reasons set forth above, defendants' motions to dismiss the indictment will be denied.

An appropriate Order will enter.