**The UNITED STATES of America, Plaintiff,**

v.

**Norby WALTERS and Lloyd Bloom, Defendants.**

No. 88 CR 709.

United States District Court, N.D. Illinois, E.D.

March 24, 1989.

Anton R. Valukas, U.S. Atty., Howard M. Pearl, Helene B. Greenwald, Asst. U.S. Attys., Chicago, Ill., for U.S.

Robert Gold, Ethan A. Levin–Epstein, Gold, Wachtel & Miller, New York City, Matthew F. Kennelly, Cotsirilos, Crowley, Stephenson, Tighe & Streicker, Ltd., Chicago, Ill., for Walters.

Dan K. Webb, George C. Lombardi, Steven F. Molo, Winston & Strawn, Chicago, Ill., for Bloom.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Defendants Norby Walters ("Walters") and Lloyd Bloom ("Bloom") are charged in a seven-count indictment with several crimes, including racketeering, extortion, and mail and wire fraud, in connection with their activities as business agents for certain sports and entertainment figures. Now before the court are both defendants' pretrial motions which raise substantial questions about the theories underlying this prosecution and the correct interpretation of several important federal criminal statutes. After careful consideration, the court denies defendants' motions for the reasons set out below.

## I. Factual Background

For purposes of these pretrial motions, the court accepts the factual allegations of the indictment as true. *United States v. Fry,* 413 F.Supp. 1269, 1272 (E.D.Mich. 1976), citing *United States v. Sampson,* 371 U.S. 75, 78–79, 83 S.Ct. 173, 174–75, 9 L.Ed.2d 136 (1962); *United States v. Lytle,* 677 F.Supp. 1370, 1374 n. 8 (N.D.Ill.1988).

Walters and Bloom are business agents for entertainment and sports figures. During the time period covered by the indictment, they conducted their business through two entities. The first, Norby Walters Associates, Inc. ("Norby Walters Associates"), was a corporation primarily engaged in the business of serving as booking agent for musical entertainers. Defendant Walters was president of and largest shareholder in Norby Walters Associates. Beginning in or about August, 1984, World Sports & Entertainment, Inc. ("WSE") was organized as a corporation in the business of recruiting and representing college athletes in negotiations of professional sports contracts. Defendant Walters was president and defendant Bloom was vice president of WSE. Both defendants were WSE shareholders.

The bulk of the allegations in the indictment concern a practice whereby Bloom and Walters, through WSE, would contract to represent undergraduate student-athletes while the students were still competing in intercollegiate athletics. The indictment alleges numerous instances where Bloom or Walters approached college football players while the players were still eligible and playing college football and offered the players money and other inducements to sign representation contracts with WSE.[1] The contracts were post-dated to make it appear that they were not signed until after the players had ceased being eligible to play college ball.

The National Collegiate Athletic Association ("NCAA"), the Mid–American Athletic Conference, the Intercollegiate Big Ten Conference ("the Big Ten") (collectively referred to herein as the "athletic regulatory bodies"), and each of the individual colleges and universities mentioned in the indictment all have regulations governing the amateur status of athletes eligible to compete in events sponsored by the entity. In substance, the regulations provide that student-athletes are ineligible to participate in a sport if they do any one of the following:

—they contract to be represented by an agent in the marketing of the individual's athletic ability or reputation in that sport.

---

1. Inducements included: "large amounts of cash, monthly wire transfers of funds; interest-free loans; automobiles; clothing; concert and airline tickets; trips to New York City; hotel accommodations; use of limousines, trips to major entertainment events; introductions to prominent entertainers; cash payments and other benefits for family members; and insurance policies." Superseding Indictment Count I, ¶ 14.

—they take any pay for participation in that sport including the promise of pay when such pay was to be received following completion of the student-athlete's intercollegiate athletic career.

—they receive financial assistance other than that administered by their schools except where the assistance comes from the athletes' family or was awarded on a basis having no relationship to athletic ability.

To ensure compliance with the regulations, the athletic regulatory bodies and the schools require every student-athlete to sign and submit each year statements containing information relating to eligibility, amateur status, and financial aid. Based on this information, the schools determine a student-athlete's eligibility to compete and to receive an athletic scholarship.

The indictment alleges numerous instances where defendants' practice of contracting with student-athletes while the athletes were still eligible to play amateur athletics resulted in allegedly false statements being submitted to universities and athletic regulatory bodies. The indictment charges that the submission of false information regarding eligibility resulted in the universities being defrauded of both scholarship money and the universities' right to distribute their limited number of athletic scholarships to individuals who are eligible to compete on behalf of the universities.

In addition to the conduct outlined above, the government charges that in some cases the defendants threatened student-athletes with physical harm if the student-athletes tried to withdraw from the contractual relationship with defendants. An unindicted third party, Michael Franzese, allegedly a member of an organized crime family, assisted defendants in obtaining and retaining clients through threats of force. In addition to threats against student-athletes, the indictment charges that at least one of Norby Walters Associates' potential enter-

tainment clients—the group known as the "Jackson Five"—was threatened with force if the group did not retain Norby Walters Associates as booking agent. Defendants are further charged with taking money from one student-athlete, Paul Palmer, on the pretext that the money would be invested on his behalf, and thereafter using the money to pay some of defendant Bloom's personal expenses. Finally, the indictment alleges that during the grand jury investigation defendants concealed from the grand jury information concerning athletes who were still competing in intercollegiate athletics.

II. The Indictment

The superseding indictment[2] contains seven counts. Count One charges a conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Section 1962(d), ("RICO"). The defendants are accused of agreeing to violate RICO Section 1962(c) by conducting and participating in the conduct of the affairs of Norby Walters Associates and WSE through a pattern of racketeering activity consisting of: multiple acts of extortion and attempted extortion; multiple acts of collection of extensions of credit by extortionate means; multiple acts of mail fraud; multiple acts of wire fraud; and multiple acts of the use of interstate facilities in furtherance of unlawful activity.

Count Two charges the substantive offense of mail fraud. The basis for the charge is the mailing of false eligibility documents by two University of Michigan football players to the Big Ten. Defendants allegedly defrauded the University of Michigan by causing the two student-athletes to submit false eligibility information upon which the players were awarded scholarships. Counts Three through Five allege identical mail frauds victimizing Michigan State University, University of Iowa, and Purdue University respectively.

---

**2.** The original indictment containing eight counts was filed on August 24, 1988. The superseding indictment was filed February 1, 1989, and made several changes of note. The superseding indictment added the allegations concerning concealment from the grand jury.

It changed slightly the property allegations of the mail fraud allegations. It also dropped one of the mail fraud counts alleging a scheme to defraud the University of Illinois. Finally, it altered somewhat the factual allegations underlying several counts.

Count Six charges a conventional conspiracy under 18 U.S.C. Section 371. Defendants are accused of agreeing to collect debts by extortionate means, to commit mail and wire fraud, and to conceal information from the grand jury.

Finally, Count Seven charges the defendants with a substantive violation of RICO under 18 U.S.C. Section 1962(c), for conducting the affairs of Norby Walters Associates and WSE through a pattern of racketeering activity as outlined in Count One.

Defendants filed several motions to dismiss on numerous grounds. In addition, defendants seek to strike some allegations in the indictment. The court discusses each claim separately.

## III. Analysis

### A. Venue

Defendants first challenge the government's choice of venue for the prosecution.[3] According to Fed.R.Crim.P. 18, "the prosecution shall be had in a district in which the offense was committed." Venue in this district is based on the mail fraud allegations that defendants caused Big Ten member universities to send various allegedly fraudulent eligibility lists, statements of eligibility, and statements of financial support to the Big Ten offices in Schaumburg, Illinois. Bloom challenges venue on two grounds: (1) because the universities themselves mailed the documents to the Big Ten, Bloom claims he did not "cause" the mailings, and (2) the mailings are too far removed from the fraudulent scheme to be considered "in furtherance" of the scheme.

■ Bloom first asserts that neither the defendant-agents nor the student-athletes are alleged to have personally mailed the forms to the Big Ten nor did they know the particulars of the universities' mailings. Although the indictment does allege that the universities, not the students, mailed the forms to the Big Ten Conference, Bloom's approach to mail fraud is too nar-

row. See, e.g., Superseding Indictment, Count I, ¶ 27(a)(8); see also United States v. Wormick, 709 F.2d 454, 461 (7th Cir. 1983).

It is well settled that a defendant "causes" a mailing for purposes of the mail fraud statute, 18 U.S.C. Section 1341, either when he makes use of the mails or when he causes someone else to do so. United States v. Castor, 558 F.2d 379, 385 (7th Cir.1977), cert. denied, 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752 (1978). In Pereira v. United States, 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954), the Supreme Court held:

> Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he "causes" the mails to be used.

The allegedly false mailings include Statements of Eligibility and Statements of Financial Support completed by each of the student-athletes. See, Superseding Indictment, Count I, ¶ 25(b)(1)-(5). These statements, which each student-athlete submitted to his university, are Big Ten Conference forms, not university forms. Each university was required to send eligibility lists compiled from these statements to the Big Ten Conference. See Superseding Indictment, Count I, ¶ 25(b)4. Clearly, the use of the mails to send documents ultimately to the headquarters of the Big Ten Conference is reasonably foreseeable. Thus, the indictment sufficiently alleges that the defendants "caused" the mailings.

■ Even if defendants did "cause" the mailings to a location in this district, Bloom argues that the mailings of the documents to the Big Ten Conference by the universities did not further the alleged fraud scheme.

The mail fraud statute specifically provides that the mailings must be "for the purpose of executing the scheme." 18 U.S.C. § 1341. In ruling on this motion to

---

**3.** Although defendants submitted separate motions and briefs, each defendant indicated he wished to join in his co-defendant's motions. For purposes of organization and clarity, the court will refer to each defendant's arguments separately with the understanding that the other defendant joins those arguments where appropriate.

dismiss, the court considers the standard set forth in *Castor, supra,* 558 F.2d at 384–85:

> The Government need not allege the subordinate evidentiary facts by which it intends to prove the "in furtherance" element of the crime charged, and an indictment setting out the mailings charged and alleging that they were in furtherance of the scheme should not be dismissed as insufficient on its face unless there is no conceivable evidence that the Government could produce at trial to substantiate its "in furtherance" allegation.

In *Wormick, supra,* 709 F.2d at 462 (citations omitted), *quoting United States v. Rauhoff,* 525 F.2d 1170, 1176 (7th Cir. 1975), the Seventh Circuit summarized the law defining the "in furtherance" requirement:

> Mailings are in furtherance of a scheme if they are incidental to an essential part of the scheme. Under this definition, mailings made after the scheme has reached its fruition are not in furtherance of the scheme, nor are mailings which conflict with the purposes of the scheme and have little effect upon the scheme. On the other hand, mailings made to promote the scheme, or which relate to the acceptance of the proceeds of the scheme, or which facilitate concealment of the scheme, have been found to have been in furtherance of the scheme under this definition.

The case of *United States v. Murphy,* 768 F.2d 1518 (7th Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986), supports the contention that the mailings at issue here are "in furtherance" of the alleged fraud scheme. In *Murphy,* the defendant, who had been an associate judge of a county circuit court, was convicted of mail fraud for depriving the people of Cook County of his honest services. The mail fraud counts were based on the mailings of cash bond refunds which the judge authorized to be sent to defense lawyers who had paid the judge bribes. In holding that the mailings were integral to the offense so as to establish violations of the mail fraud statute, the Court stated:

> [T]he statute does not demand that the mail ... be essential to the offense. It may be enough if the use of the mail is an ordinary or expectable event in the course of the scheme and the mailings further the scheme.

768 F.2d at 1530. Here, the mailings of the documents to the Big Ten Conference by the universities are an expected part of the scheme and the mailings clearly further the scheme.

Further, a jury could reasonably conclude that the mailings in this case are an essential part of the scheme because they facilitated concealment of the scheme. If the universities or the Big Ten Conference had been given truthful information on the forms, the universities could have terminated the student-athletes' football scholarships and prevented the athletes from playing with the team. Such an occurrence could seriously affect a particular athlete's value to defendants. *See e.g.,* Superseding Indictment, Count I, ¶ 25(b)(2)-(5).

Bloom primarily relies on *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), *United States v. Staszcuk,* 502 F.2d 875 (7th Cir.1974), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed. 2d 56 (1975), and *United States v. Kwiat,* 817 F.2d 440 (7th Cir.1987), to support his position. These cases are distinguishable.

In *Maze, supra,* the defendant charged motel services on a stolen credit card. The mailings that formed the basis of the mail fraud counts were the mailings of sales slips for purchases from the motels to the bank that had issued the card. The Court found:

> ... [T]he mailings here were directed to the end of adjusting accounts between ... the victims of respondent's scheme. Respondent's scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss.

*Id.* at 402.

In *Staszcuk, supra,* the defendant, a city alderman, was convicted of mail fraud for

accepting money in exchange for his approval of zoning changes. The mailings that formed the basis for the mail fraud were form notices setting the date for a public hearing. The Seventh Circuit noted:

... the notices had little effect on the procedure of passing the amendments ... from either a procedural or a factual point of view, the committee's mailing of notices seems too remote from defendant's scheme to support a connection under section 1341.

*Id.* at 880–81.

Finally, in *Kwiat, supra,* the mail fraud convictions were based on the charge that a president of a bank and other defendants perpetrated a scheme to defraud the bank's depositors and stockholders. The mailings were mortgage instruments sent by the recorder of deeds to the bank. The Seventh Circuit held:

The mailings in this case ... did not make the fraud possible or facilitate it. They did not help [defendants] rake in the money from the Bank ... [or] hide their delicts or postpone the day of reckoning.

*Id.* at 443.

Unlike *Maze, Staszcuk,* and *Kwiat,* the documents mailed in this case were essential to the perpetration and concealment of the alleged fraud. The success of the scheme depended in part on the student-athletes' receipt of scholarship monies. The mailings postponed the day of reckoning.

We therefore conclude that the government could conceivably produce evidence at trial showing that the mailings were for the purpose of executing the scheme. *See Castor, supra,* 558 F.2d at 384 ("The resolution of the question of whether the mailings alleged were in furtherance of the scheme must await trial."). Because the mailings charged in the indictment are sufficient to support venue, Bloom's motion to dismiss for lack of venue is denied.

**4.** Walters moves to dismiss the mail fraud counts of the indictment in particular because

### B. Antitrust Laws

■ Defendants move to dismiss the indictment on the ground that the eligibility regulations violate federal antitrust laws.[4] Defendants argue that the eligibility rules which restrict the compensation student-athletes receive constitute illegal price-fixing and enforcement of these rules constitutes an illegal group boycott in violation of the Sherman Act. The government argues in response that the NCAA eligibility requirements and principles of amateurism adopted by the universities do not constitute unreasonable restraint of trade in violation of the Sherman Act.

Both sides cite the case of *NCAA v. Board of Regents of the Univ. of Okla.,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), to support their respective positions. The court finds that the *Board of Regents* case supports the government's argument.

In *Board of Regents,* the Supreme Court held that the antitrust laws apply to some aspects of intercollegiate football and that the NCAA's restrictions on the ability of its member schools to sell the rights to televise the schools' football games violated those laws.

The Court distinguished the NCAA's amateur eligibility rules, which the Court found fully consistent with the antitrust laws, from the challenged restraints on college football telecasts, which were invalid:

It is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive because they enhance public interest in intercollegiate athletics. The specific restraints on football telecasts that are challenged in this case do not, however, fit into the same mold as do rules defining the conditions of the contest, *the eligibility of participants,* or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture.

the alleged "property" rights upon which these counts rest violate the federal antitrust laws.

*Id.* at 117, 104 S.Ct. at 2969 (emphasis added).

The Court further explained:

[T]he NCAA seeks to market a particular brand of football—college football. The identification of this "product" with an academic tradition differentiates college football from and makes it more popular than professional sports to which it might otherwise be comparable, such as, for example, minor league baseball. *In order to preserve the character and quality of the "product," athletes must not be paid, must be required to attend class, and the like.* And the integrity of the "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive.

*Id.* at 101–102, 104 S.Ct. at 2960–61 (emphasis added, footnote omitted). Likewise, two dissenters shared the majority's sentiments regarding many of the NCAA's rules, including those limiting the compensation of student-athletes:

... each of these regulations represents a desirable and legitimate attempt "to keep university athletics from being professionalized to the extent that profit making objectives would overshadow educational objectives."

*Id.* at 123, 104 S.Ct. at 2972 (White, J.) (citation omitted).

In *McCormack v. National Collegiate Athletic Ass'n.*, 845 F.2d 1338 (5th Cir. 1988), plaintiffs argued, as do defendants in this case, that the eligibility rules concerning restrictions on compensation to college football players constituted illegal price fixing. After reviewing these regulations under the rule-of-reason analysis, the Fifth Circuit held that the NCAA's eligibility rules were reasonable and therefore did not violate the antitrust laws.

The *McCormack* court found the fact that the NCAA permits some compensation through scholarships does not undermine the rationality of the eligibility requirements:

That the NCAA has not distilled amateurism to its purest form does not mean its attempts to maintain a mixture containing some amateur elements are unreasonable. We therefore conclude that the plaintiffs cannot prove any set of facts that would carry their antitrust claim and that the motion to dismiss was properly granted.

*Id.* at 1345.

Bloom cites several cases to support his argument that "similar restrictions limiting the right of athletes to receive compensation in a competitive market have been held illegal." Defendant Bloom's Motion to Dismiss the Indictment on Antitrust Grounds, p. 6. All these cases are distinguishable because they involve professional leagues, not college football. As the Supreme Court in *Board of Regents, supra,* observed: "[t]he identification of this 'product' [college football] with an academic tradition differentiates college football from and makes it more popular than professional sports to which it might otherwise be comparable...." 468 U.S. at 101–102, 104 S.Ct. at 2960; *see also McCormack, supra,* 845 F.2d at 1344–1345.

We find, based upon *Board of Regents* and *McCormack,* that the NCAA's eligibility rules, on their face, do not violate the federal antitrust laws. As such, enforcement of those rules and regulations does not constitute an illegal boycott, contrary to Bloom's assertion. *See McCormack, supra,* 845 F.2d at 1345; *Justice v. NCAA,* 577 F.Supp. 356 (D.Ariz.1983).

### C. Mail Fraud Allegations

█ Next, defendants seek dismissal of the substantive mail fraud counts and the mail fraud allegations in the remaining counts based on what is commonly referred to as a *"McNally"* argument. In *McNally*

*v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court restricted the scope of the mail fraud statute to schemes to defraud victims of "money or property." [5] Defendants argue here that the universities were not defrauded of money or property.

*McNally* involved several individuals who were convicted of mail fraud based on their participation in a self-dealing patronage scheme which allegedly defrauded the citizens and government of Kentucky of certain "intangible rights," such as the right to have the commonwealth's affairs conducted honestly. Pursuant to the scheme, a *de facto* state official received portions of commissions which were paid by the commonwealth's insurers to an intermediary insurance company which presumably arranged the coverage. According to the Court:

> The violation asserted is the failure to disclose [defendant's] financial interest [*i.e.,* in receiving the insurance commissions], even if state law did not require it, to other persons in the state government whose actions could have been affected by the disclosure. It was in this way that the indictment charged that the people of Kentucky had been deprived of their right to have the Commonwealth's affairs conducted honestly.

*McNally, supra,* 107 S.Ct. at 2882, n. 9. The Court held that the victims, the citizens and government of Kentucky, were not deprived of "money or property" by this scheme. The Court characterized the right to honest government as an "intangible right" which was not protected by the federal mail fraud statute. The Court thus reversed the convictions.

The Supreme Court further clarified the contours of the new mail fraud "money or property" requirement in *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). There, defendants were charged with mail fraud in connection with a scheme to appropriate confidential news information from the Wall Street Journal. The Court ruled that the confidential information was property, stating that:

> its intangible nature does not make it any less "property" protected by the mail and wire fraud statutes. *McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights.

*Id.* 108 S.Ct. at 320.

The instant indictment alleges that the defendants defrauded the universities of two types of "property":

> (a) ... money and property in the form of tuition, room, board, fees, and other financial assistance provided to student-athletes on the basis of false certifications submitted to the student-athlete's school; and
>
> (b) ... [the universities'] right to control the allocation of a limited number of athletic scholarships to student athletes who the universities considered to be eligible, under the rules and regulations adopted by the university, to compete and represent the school in intercollegiate football and to receive an athletic scholarship in that sport.

Superseding Indictment, Count I, ¶ 22(a), (b).[6]

---

**5.** Prior to *McNally,* courts read the statutory prohibition of schemes or artifices "to defraud" *or* "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ..." in the disjunctive, so that the money or property limitation of the second phrase did not limit schemes to defraud to those aimed at causing deprivation of money or property. *See, e.g., U.S. v. Holzer,* 816 F.2d 304, 310 (7th Cir.) (state judge convicted of mail fraud for defrauding attorneys and parties of the rights to have the business of the Circuit Court of Cook County conducted honestly, fairly and impartially, free from corruption, collusion, bias, partiality, dishonesty, breach of duty, conflict of interest, extortion, bribery, and fraud), *vacated* — U.S. ——, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987) (remanding for reconsideration in light of *McNally* ).

**6.** The government altered the language of Section 22(a) from the original indictment to the superseding indictment. The original indictment alleged a scheme "to defraud [the universities] of money and property...." The superseding indictment alleges a scheme "to defraud [the universities] *and* to obtain money and property ..." Bloom submits that the language of the superseding indictment fails to state a violation of the mail fraud statute because *Section 22(a)*

In the court's view, this indictment does not run aground on *McNally*. The property deprivation alleged in ¶ 22(a) consists of tangible money and property in the form of scholarship money and room, board, tuition waivers and fees. The indictment alleges a very basic fraud scheme: particular student-athletes obtained tangible property from their universities based on fraudulent misrepresentations of material facts concerning the student-athlete's eligibility status.

Walters argues nonetheless that the universities were not defrauded of money or property as a result of the student-athletes' misrepresentations because the universities suffered no economic loss. Walters explains that because each university had a limited number of scholarships to distribute, "it is clear that these universities would have paid precisely the same amount in athletic scholarships, whether to these students or to others." Brief in Support of Defendant Norby Walters' Pre–Trial Motions at p. 11.

Further, Walters submits that the universities got exactly what they paid for: football players. Because the frauds were not discovered until after the student-athletes had finished playing football for the universities, the universities did not lose revenue from stadium receipts or television rights.

■ Walters' arguments are not persuasive. Walters' premise that a mail fraud victim must suffer economic or monetary loss in order to be defrauded was rejected by the Supreme Court in *Carpenter. Carpenter v. United States, supra,* 108 S.Ct. at 321 ("Petitioners cannot successfully contend ... that a scheme to defraud requires a monetary loss...."). In addition, relying on *Carpenter,* other courts have considered and declined to adopt arguments identical to Walters' arguments.

In *United States v. Cooper,* 677 F.Supp. 778 (D.Del.1988), the defendant was charged with wire fraud for submitting false time sheets to a stevedoring company. The time sheets were false because they stated that the defendant's son had performed the work and was entitled to compensation when the defendant/father had actually performed the work. The defendant argued that the stevedoring company did not suffer any financial loss because the stevedoring company would have been required to pay someone for the same services provided by defendant. The *Cooper* court rejected the defendant's argument, finding that his conduct fell within the clear language of the wire fraud statute, 18 U.S.C. Section 1343, which proscribes a scheme or artifice "for obtaining money or property by means of false or fraudulent pretenses" without any reference to financial loss by the victim.[7]

Likewise, in *United States v. Thomas,* 686 F.Supp. 1078 (M.D.Pa.1988), the court rejected a defense argument that the payment of salaries and benefits to police officers did not constitute a deprivation of property because the victim city would have paid the salaries in any event. In *Thomas,* defendants were charged with a scheme to rig police entrance exams to secure appointment for favored candidates to positions as patrolmen. The indictment alleged that the city was deprived of tangible property in the form of salaries and benefits paid to police officers who had not legally qualified for the position of patrolman. The *Thomas* court held that:

[t]he *Carpenter* decision, supported by the *Cooper* opinion, presents the control-

now alleges separate schemes to defraud and to obtain money and property. Defendant Bloom's Motion to Dismiss the Mail Fraud Counts of the Superseding Indictment at p. 2, ¶ 3. Although it is not clear why the government has chosen to complicate the mail fraud allegations, the essence of the charge in ¶ 22(a) remains the same. Defendants are accused of defrauding the universities of money and property. *See United States v. Wellman,* 830 F.2d 1453, 1463 (7th Cir.1987) ("The legal character-

ization the indictment places on the scheme should not obscure the fact that the specific conduct alleged in the indictment is clearly proscribed by the mail fraud statute").

7. The relevant language of the mail fraud statute is identical to the wire fraud statute. This discussion concerning the viability of the mail fraud allegations applies with equal force to the wire fraud allegations.

ling law and the better-reasoned approach, i.e., that the clear language of the mail fraud statute does not require a net monetary loss incurred by the city of Scranton in order to find that the city was fraudulently deprived of its property.

*Id.* at 1085. *See also United States v. Lytle,* 677 F.Supp. 1370, 1375 (N.D.Ill.1988) (discussed further infra.)

Thus, even if the universities would have paid out the same amount of money in athletic scholarships to other students had the defendants not concealed their actions, the universities were still defrauded of money and property by the actions of these particular student-athletes. The universities need not experience a net financial loss to qualify them as mail fraud victims.

The indictment alleges a second type of property deprivation in ¶ 22(b). There, the government alleges that the universities were defrauded of their "right to control" allocation of their limited number of athletic scholarships. Intuitively, it is difficult to separate the tangible property of the scholarships from the intangible property right to control allocation or disposition of the scholarships. According to the common law:

> The word "property," in law, is not the material object itself, but it is the right and interest or domination which is rightfully and lawfully obtained over the material object, with the unrestricted right to its use, enjoyment and disposition, either limited or unlimited in duration.

*Sheperd v. Marsaglia,* 31 Ill.App.2d 379, 384, 176 N.E.2d 473 (2d Dist.1961). *See generally United States v. Evans,* 844 F.2d 36, 40–42 (2d Cir.1988) (discussing role of common law definitions of property in defining property for purpose of mail fraud statute).

It follows that the property right identified in ¶ 22(b) is but one property right already encompassed by the bundle of property rights represented by allegation (a). In the court's view, that the universities are limited by amateur competition regulations in the number of football players to whom they can distribute their property does not create any additional property right. In any event, the defendants are not prejudiced by the overlap between ¶ 22(a) and ¶ 22(b). In *United States v. Wellman,* 830 F.2d 1453 (7th Cir.1987), the indictment similarly charged two overlapping property deprivations. There the defendant was alleged to have schemed to both (1) defraud the victim of its right to have a product meeting certain government requirements and (2) obtain money by means of false and fraudulent pretenses, representations, and promises. The Seventh Circuit held that

> even assuming that these allegations were (in form at least) separate, the government could not logically prove one scheme without proving the other since the elements of the two were identical. The legal characterization the indictment places on the scheme should not obscure the fact that the specific conduct alleged in the indictment is clearly proscribed by the mail fraud statute. In sum, we believe that *McNally* prescribes more than a rule of pleading.

*Id.* at 1463.

■ That the intangible property right to control disposition of property is protected by the mail fraud statute is consistent with the Supreme Court's opinion in *Carpenter.* The property at issue there was itself intangible: confidential securities information owned by the Wall Street Journal. Although the defendants did not use the confidential information to harm the Journal by, for example, selling it to a competitor, the defendants appropriated the information for their own stock fraud scheme and harmed the Journal by interfering with the Journal's right to control how their information was used. *Carpenter, supra,* 108 S.Ct. at 321 ("The confidential information was generated from the business and the business had a *right to decide how to use it* prior to disclosing it to the public.") (emphasis added).

A defendant's interference with the victim's right to control distribution of its property in accordance with internal rules and regulations recently formed the basis for a mail fraud prosecution in a situation similar in many respects to the instant

case. In *United States v. Lytle*, 677 F.Supp. 1370 (N.D.Ill.1988), the government alleged a scheme by a bank employee to defraud the bank of "money in the form of loans" by making loans in violation of the bank's customary lending policies. *Id.* at 1375. The defendant argued, as do defendants in this case, that because there were no allegations that the bank suffered a pecuniary loss from the loans, *i.e.*, that the loans were bad, there was no fraud. The court rejected that argument. Following *Carpenter*, the district court held that the victim-bank did not have to suffer pecuniary loss on the loans; it was enough that the bank's intangible property right to exclusive control of its money was violated.

*Carpenter* and *Lytle* provide persuasive support for the validity of the mail fraud counts in this indictment.[8] The gist of the fraud scheme alleged here is defendants' interference with the universities' right to control distribution of its own money and property in the form of scholarships. Defendants interfered with the property right by obtaining money and property through false representations. The court finds the indictment consistent with *McNally*. Defendants' motions to strike and dismiss the mail fraud allegations are denied.

### D. Due Process Claim

■ Walters argues that even if the court finds that the mail fraud allegations state a violation, the prosecution cannot continue because our interpretation of the mail fraud statute is so novel and unprecedented that Walters was not put on notice that his conduct might be considered criminal. While the court agrees that the precise factual situation here is a case of first impression, the court finds that the fraudulent nature of the transactions with the student-athletes is sufficiently clear to have afforded Walters notice.

Walters is accused of participating in a scheme to sign professional representation contracts with football players while they were still competing in intercollegiate athletics. An essential component of the scheme was ensuring that the athletes retained their football scholarships and continued to play football up to the time they would be eligible for the professional football draft. The student-athletes' submission of false statements to universities in order to receive scholarship money was a necessary component of the scheme. The illegality of a scheme to deprive an entity of money through the use of false or fraudulent misstatements is consistent with a common understanding of the concept of fraud. *See Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924) (term "to defraud" refers "to wronging one in his property rights by dishonest methods or schemes"

---

**8.** This court is not unmindful of *United States v. Holzer*, 840 F.2d 1343 (7th Cir.1988), decided after both *Carpenter* and *Lytle*, wherein the Seventh Circuit also addressed the *McNally* decision. *Holzer* was concerned with an entirely different legal issue from this case. There, a state judge who took bribes was convicted of mail fraud for defrauding the State of Illinois, its citizens, and the parties on the other side of the cases from the lawyers who bribed him, of the administration of justice by an honest judge. The circuit court interpreted *McNally* in the context of whether Holzer had defrauded his employer, the State of Illinois, of money and property by accepting and retaining bribe money. The court answered this question in the negative and vacated Holzer's mail fraud conviction.

In passing, the *Holzer* court commented that:
A further complication in *McNally* was that the moneys the defendants had received were not bribes pure and simple. The state would have paid the commissions to some insurance agency, perhaps in the same amount—perhaps indeed to the same agency. The deprivation really was of an intangible right.

*Id.* at 1346–47. Defendants herein place great emphasis on this dicta from *Holzer*, arguing that the language forecloses a mail fraud prosecution based on deprivation of the right to control property. Although defendants' arguments have logical appeal, this court is respectfully not convinced that the language in *Holzer* defeats this prosecution in light of the *Carpenter* decision and, indeed, the Supreme Court's explicit notation in *McNally* that the jury therein was not charged that to convict it must find that Kentucky was deprived of control over how its money was spent. *See McNally, supra,* 107 S.Ct. at 2882. Further, the Seventh Circuit recently cited with approval *Carpenter's* holding that a fraud victim need not suffer monetary loss; deprivation of the right to use property stated a mail fraud violation. *See Lombardo v. United States*, 865 F.2d 155, 158 (7th Cir.1989).

and "usually signifies the deprivation of something of value by trick, deceit, chicanery or overreaching").

Most significant to the court are the allegations that Walters attempted to conceal his activities. Actions such as post-dating the agency contracts, paying wire transfers of cash to third parties, and instructing athletes not to tell the universities about the contracts are strong evidence that Walters himself knew his actions were wrong. *See United States v. Dial,* 757 F.2d 163, 168 (7th Cir.), *cert. denied,* 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985); *United States v. Holzer,* 816 F.2d 304, 309 (7th Cir.), *vacated on other grounds,* — U.S. ——, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987). Walters' motion to dismiss the mail fraud counts on due process grounds is denied.

### E. Multiple Conspiracies

Defendants seek dismissal of the two conspiracy counts, Counts I and VI, on the ground that each count improperly alleges multiple conspiracies. According to Fed.R. Crim.P. 8(a), two or more offenses can be charged in the same indictment but each offense must be charged in a separate count. Charging several conspiracies in the same count violates this rule and leads to evidentiary and appellate confusion.

### 1. Count I

■ Count I charges a RICO conspiracy under 18 U.S.C. Section 1962(d). The principal Seventh Circuit case on RICO conspiracies is *United States v. Neapolitan,* 791 F.2d 489 (7th Cir.1986). There the court explained that:

> [a] section 1962(d) conspiracy is not a new generic category of conspiracy but a specific goal of traditional conspiracy law. *This section of RICO is capable of providing for the linkage in one proceeding of a number of otherwise distinct crimes and/or conspiracies through the concept of enterprise conspiracy.* The government, through the vehicle of the indictment, provides the linking conspiratorial objective of a *specific* RICO violation. *United States v. Sutherland,* 656 F.2d 1181, 1191–93 (5th Cir.1981). The "specific" violation can

be broad or narrow depending on the number of predicate crimes within the scope of the agreement that the government chooses to identify.

*Id.* at 501 (emphasis added).

Defendants argue that because Count I alleges several different conspiracies as predicate acts for the 1962(d) conspiracy, Count I improperly alleges multiple conspiracies in a single count. This argument is clearly foreclosed by *Neapolitan.* So long as the government alleges, as it does here, that the defendants entered into a *single agreement* to achieve a RICO objective of violating RICO Sections 1962(a), (b), or (c), then the indictment states a proper 1962(d) charge. *Id.* at 497–98; *see* Superseding Indictment, Count I, ¶ 4. That the predicate acts may themselves be separate conspiracies does not invalidate the count.

### 2. Count VI

Count VI charges defendants with a conventional conspiracy under 18 U.S.C. Section 371. The count alleges one agreement between the defendants to commit several crimes all in connection with the defendants' representation of student-athletes. The specific crimes are the mail and wire fraud victimizing the universities, the collection of debts by extortionate means victimizing the student-athletes, the mail and wire fraud victimizing one particular athlete, Paul Palmer, and the concealment of information from the grand jury.

The gist of a Section 371 conspiracy is an agreement among conspirators to commit an unlawful act or to accomplish a lawful act through unlawful means. *See United States v. Caplan,* 633 F.2d 534 (9th Cir. 1980). "The scope of the agreement determines the scope of the conspiracy." *United States v. Bruun,* 809 F.2d 397, 405 (7th Cir.1987). The Seventh Circuit defines the difference between single and multiple conspiracies as follows:

> Separate conspiracies exist when each of the conspirators' agreements has its own end, and each transaction constitutes an end in itself. If, on the other hand, the agreements between the conspirators represent stages or different functions to

be performed in the formulation of a larger scheme, the object of which is to effectuate a single unlawful result, then there is a single conspiracy....

*United States v. Napue*, 834 F.2d 1311, 1332 (7th Cir.1987) (citations omitted).

■ Defendants argue that the separate crimes alleged in Count VI are so diverse that they cannot be classified as a single scheme. The court does not agree. The government alleges a single agreement to commit separate crimes. That the indictment alleges separate crimes is not fatal, "there may be a single conspiracy even though the commission of two or more offenses is contemplated." *United States v. Bruun, supra*, 809 F.2d at 406. Further, on the facts alleged here, the separate crimes alleged could conceivably be part of a larger scheme by defendants to act as business agents for college football players. The jury will determine whether the government has proven the single agreement. The court finds no infirmity in Count VI.

### F. Enterprise Allegation

Bloom moves for dismissal of the two RICO counts, Counts I and VII, on the ground that the RICO enterprise allegation is deficient. A RICO "enterprise" is defined as "any individual, partnership, corporation, association or legal entity, and any union or group of individuals associated in fact although not a legal entity...." 18 U.S.C. § 1961(4). The enterprise allegation in the indictment states: "Norby Walters Associates and World Sports & Entertainment were an 'enterprise' that is, an association in fact, ..." Superseding Indictment, Count I, ¶ 2(d).

Bloom points out that the indictment alleges WSE was not organized until 1984. Thus, Bloom argues, WSE could not have been associated in fact with Norby Walters Associates as a RICO enterprise from 1981 through 1984, four of the seven years during which the enterprise allegedly operated. Bloom argues that he is prejudiced by the improper enterprise allegation because the enterprise ties Bloom to unrelated organized crime activities of Norby Walters Associates during the period 1981–1984.

According to the Seventh Circuit, "the central element of an enterprise is structure." *United States v. Neapolitan, supra*, 791 F.2d at 500. When an enterprise is also a legal entity, structure is easy to find. Where, however, an enterprise is an association in fact, the enterprise must be

> an association having an ascertainable structure which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined apart from the commission of the predicate acts constituting the "pattern of racketeering activity."

*Id.* quoting *United States v. Anderson*, 626 F.2d 1358, 1372 (8th Cir.1980), *cert. denied* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). In this case, the essential structure of the agency business operated by Norby Walters Associates is alleged to have continued from 1981 through 1987 and includes the later incorporation of and association with WSE. Indeed, the essential structure of the business seems not to have changed significantly through the addition of WSE: WSE had no offices, bank accounts, telephones, or employees of its own, it operated its business as part of Norby Walters Associates. The government has adequately pled a RICO enterprise.

■ Bloom's argument that he is prejudiced by this particular enterprise allegation is novel. Based on the intended broad sweep of the RICO statute, *see Neapolitan, supra*, 791 F.2d at 495 ("the Supreme Court has consistently adhered to a broad, literal reading of the statute"), the court finds that a defendant who later joins an enterprise can be linked to the enterprise's previous predicate acts. Indeed, once a defendant becomes a co-conspirator in a RICO conspiracy, he is responsible for previous acts of the conspiracy. *Neapolitan, supra*, 791 F.2d at 505. *See also United States v. Stern*, 858 F.2d 1241 (7th Cir.1988) (One conspiracy not two charged in operation of ongoing prostitution RICO enterprise although one conspirator joined at a later date). Here, if Bloom joined a

previously existing RICO conspiracy among Walters, Franzese, and others, he can be held criminally responsible for their earlier actions. Further, a defendant who participates in the conduct of the affairs of an enterprise through racketeering activities cannot complain that being linked to that same enterprise prejudices him. Defendant himself chose the enterprise.[9]

## G. Hobbs Act

The Hobbs Act provides in part:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to so do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years or both.

18 U.S.C. § 1951.

Paragraph 27 of Count I and paragraphs 12–14 of Count VII contain the government's Hobbs Act allegations. In essence, they charge that defendants conspired to commit and did commit extortion by threatening three student-athletes with physical harm, and one student-athlete with harm to his reputation, if they did not honor their representation agreements with WSE.

Bloom argues that these allegations fail to state an offense under the Hobbs Act for two reasons: first, because they fail to allege the *wrongful* use of actual or threatened force (a "claim of right" defense); and second, because they fail to allege an effect on interstate commerce.[10]

### 1. Claim of Right Defense

■ Bloom claims that he and Walters had a legitimate claim to the property, *i.e.*, the representation agreements with the student-athletes, concerning which they were making threats. Because they had a legitimate claim to the property, Walters and Bloom claim their threats of force to retain that property were not "wrongful" and extortionate in violation of the Hobbs Act.

Bloom's argument is based on *United States v. Enmons*, 410 U.S. 396, 400, 93 S.Ct. 1007, 1010, 35 L.Ed.2d 379 (1973), where the Supreme Court arguably recognized such a defense. Although the Seventh Circuit has never had occasion to apply this aspect of *Enmons*, every circuit court to interpret *Enmons* has limited the case to situations where there is a clear congressional intent that the Hobbs Act not apply. *See United States v. Agnes*, 753 F.2d 293, 299 (3d Cir.1985) (listing cases). *Enmons* itself concerned a labor dispute; the Court found that the Hobbs Act was not intended to cover cases of strike violence. *Id.* at 298. This court adopts the reasoning in *Agnes* and declines to recognize a claim of right defense.

### 2. Effect on Interstate Commerce

■ Bloom also argues that the indictment fails to establish that the extortionate activity affected or interfered with interstate commerce. In particular, Bloom posits that threats to enforce a contract right with an individual where such extortion would only diminish the individual's assets in an amount he freely agreed to could not possibly have an effect on interstate commerce. Bloom cites in support *United States v. Mattson*, 671 F.2d 1020 (7th Cir.

---

**9.** Bloom also claims that the allegations concerning the fraud on Paul Palmer should be stricken from the RICO counts because they lack a nexus to the alleged enterprise. Bloom argues that because the indictment alleges that he alone received Palmer's money and used it to pay Bloom's personal expenses, there is no nexus to the enterprise. The court notes that the indictment pleads that both Walters and Bloom participated in the fraud against Palmer. Further, "using one's position in the enterprise to line one's pocket through a pattern of racketeering activity" provides a link between the activity and the enterprise even if the enterprise itself does not directly benefit. *United States v. Ambrose*, 740 F.2d 505 (7th Cir.1984).

**10.** Bloom also challenges venue here for the extortion allegations. As previously discussed herein, the court finds that venue for this indictment is proper based on the mail fraud allegations. The extortion allegations are additional predicate acts for substantive and conspiracy RICO counts and do not need to establish separate grounds for venue.

1982). There the court reversed a Hobbs Act conviction based on defendants' extortion of $3,000 from an individual seeking an electrician's license because it found that the extortion of the individual failed to affect commerce.

It is well established that the Hobbs Act reaches to the limits of the commerce clause. *United States v. Anderson*, 809 F.2d 1281, 1286 (7th Cir.1987). Thus "the act reaches conduct where the effect on interstate commerce is slight and where there is no actual effect proved but there is a realistic probability of an effect." *Id.*

The present indictment pleads at least a realistic probability of an effect on interstate commerce. The extortionate activity alleged is defendants' threats of force to enforce contract rights against individual college athletes. The contracts entitled defendants to represent athletes in negotiations with teams in the National Football League. College and professional football players and teams travel in interstate commerce and could have an effect on interstate commerce in a variety of ways. Defendants sought commissions from the players which would have been paid in part based on the salaries and bonuses players receive from teams which operate across state lines. This case is different from *Mattson* where the extortion concerned entirely local activities and there was no connection between the extorted money and interstate commerce. The court rejects Bloom's challenge to the Hobbs Act allegations.

### H. Surplusage

Walters moves the court to strike certain of the indictment's allegations as surplusage. Generally,

> [a]llegations will be stricken as surplusage only if "it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." Simply put, legally relevant information is not surplusage. Consequently, due to the exacting standard, motions to strike information as surplusage are rarely granted.

*United States v. Bucey*, 691 F.Supp. 1077, 1081 (N.D.Ill.1988) (citations omitted).

Walters challenges three types of allegations. First, Walters asks the court to strike the portion of the indictment captioned "Relevant Statutes" which describes and summarizes various laws of the United States including the mail and wire fraud statutes. Walters argues that summarizing the statutes is prejudicial because the jurors might infer therefrom that the prosecution has special expertise in the law and that consequently the jurors should take their guidance on the law from the U.S. Attorney not the court. The court doubts that the jury would make such an unwarranted inference. Because the statutes are clearly relevant to the instant charges and the defendants have not articulated a plausible reason why they will be prejudiced by the summaries' inclusion in the indictment, those allegations will remain.

Next, Walters asks the court to strike the portions of the indictment which describe the rules and regulations of the athletic regulatory bodies. Walters fears that the jurors will assume that the rules and regulations are applicable to defendants and that violation of the rules alone constitutes fraud. In opposition, the government argues that the rules and regulations are highly relevant to the indictment's description of the fraud and should not be stricken. The court believes that the jury instructions will adequately instruct the jury as to the fraud charged and the rules and regulations allegations will not prejudice defendants. These allegations also will remain.

Finally, Walters asks the court to strike paragraph 12 of Count I because it alludes to extortion against unidentified "entertainment clients" which is not charged anywhere else in the indictment. According to Walters, the paragraph allows the jury to draw the inference that the defendants are accused of crimes not charged.

The court does not agree. Defendants are charged with extorting at least one entertainment client—the musical group the Jackson Five. Further, the paragraph describes the role of an unindicted co-con-

spirator in the operations of the enterprise and, as such, is relevant to the indictment's charges. This allegation, too, remains.

## IV. Conclusion

For the reasons explained above, defendants' pretrial motions are denied.