**UNITED STATES of America, Plaintiff,**

**v.**

**Darryl S. GRANBERRY, Defendant.**

**No. 89–110CR(1).**

United States District Court,
E.D. Missouri, E.D.

Nov. 15, 1989.

Timothy Wilson, Asst. U.S. Atty., St. Louis, Mo., for plaintiff.

David Rosen, Federal Public Defender, St. Louis, Mo., for defendant.

## MEMORANDUM

NANGLE, Chief Judge.

Defendant Darryl S. Granberry has been charged in a two-count indictment with violations of the mail fraud statute, 18 U.S.C. § 1341, in connection with his application for a Missouri School Bus Operator's Permit. Defendant was first charged with violations of the mail fraud statute with respect to his application for a Missouri School Bus Operator's Permit in *United States v. Granberry*, No. 89–28Cr(1) (E.D. Mo.1989) ("*Granberry I* "). The indictment in *Granberry I* alleged that defendant used the United States Mail to obtain a bus operator's permit by means of fraudulent representations. This Court dismissed the indictment against defendant in *Granberry I* because it found that the State of Missouri was deprived of no property interest within the meaning of *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), and that the indictment, therefore, failed to allege a violation of 18 U.S.C. § 1341. *United States v. Granberry*, No. 89–28Cr(1) (E.D.Mo. April 25, 1989).

Subsequently, the Grand Jury reindicted defendant, and the instant action was filed. The acts alleged in the instant indictment and the acts alleged in *Granberry I* do not differ. The instant indictment, however, sets forth the factual underpinnings of the alleged crime with greater specificity and enumerates the alleged property deprivations that resulted from defendant's actions. The Court sets forth below the underlying facts and the property deprivations as alleged in the indictment.

To obtain a bus operator's permit, defendant had to pass a medical examination, a

special driver's examination and complete and submit an application along with a $3.00 fee to the Driver's License Bureau of the Missouri Department of Revenue. The government alleges that defendant applied for employment with the Normandy School District as a school bus driver and that he denied in his employment application that he had any prior felony convictions when, in fact, defendant had been convicted of First Degree Murder on March 12, 1971, in the Circuit Court of St. Louis County. The government further claims that defendant stated in his June 27, 1989, application for a bus operator's permit that he had never been convicted of murder and that he certified that said representation was true by signing the application. On August 8, 1988, the Normandy School District mailed defendant's application for an operator's permit to the Department of Revenue. On August 27, 1988, the Department of Revenue mailed defendant's bus operator's permit to the Normandy School District. The school district then hired defendant as a school bus driver, which the government claims would not have been the case had the school district known of defendant's prior murder conviction.

Count I of the indictment focuses on the August 8, 1988, mailing of defendant's application by the school district to the Department of Revenue. Count II of the indictment focuses on the August 27, 1988 mailing of a bus operator's permit by the Department of Revenue to Normandy School District. Both counts allege that defendant's actions constitute a scheme and artifice to defraud and obtain money and property from Normandy School District and the State of Missouri by means of false and fraudulent pretenses and representations, in violation of 18 U.S.C. § 1341. The indictment sets forth the property that defendant "did defraud and obtain" from the school district and the State of Missouri as follows:

(A) Money and Property of the Normandy School District:

(1) Money from the Normandy School District in the form of wages paid,

(2) Property of the Normandy School District being the exclusive control of the distribution of a limited number of school bus driving jobs,

(3) Property of the Normandy School District being the exclusive control of how its money is spent,

(4) Property of the Normandy School District being the exclusive control of who it hires to drive its children to and from school,

(5) Property of the Normandy School District being its control of its tortious liability as a result of the hiring of a First Degree Murderer to drive its children to and from school,

(6) Property of the Normandy School District, said property being its exclusive control over the persons and type of persons with whom it decided to enter employment agreements and contracts.

(B) Money and property of the State of Missouri:

(1) Property of the State of Missouri being the control of how its Department of Revenue spends its resources processing school bus operator permit applications,

(2) Money of the State of Missouri in the form of expenses and costs of processing a fraudulent school bus operator permit application,

(3) Property of the State of Missouri being the exclusive control of distribution of school bus operator permits,

(4) Property of the State of Missouri being the physical piece of paper namely, the School Bus Operator Permit.

(Indictment p. 5)

Defendant has filed a motion to dismiss the indictment wherein defendant claims that the indictment should be dismissed because it fails to allege a scheme to obtain "money or property" as required by *United States v. McNally*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Defendant also suggests that the Missouri statute that prohibits individuals convicted of certain felonies and misdemeanors from obtaining a bus operator's permit is unconstitutional and that the mail fraud statute may not be employed "to vindicate an un-

constitutional state law". The Court will only address defendant's "money or property" argument because, for the reasons set forth below, the Court concludes that the indictment fails to allege a violation of the mail fraud statute under *McNally*.

## THE "MONEY OR PROPERTY" REQUIREMENT UNDER *McNally*

Section 1341 of Title 18 of the United States Code provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

In *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the United States Supreme Court held that the mail fraud statute is limited to the protection of property rights and that the statute does not reach alleged deprivations of the citizenry's intangible right to "good government". *Id.* at 359–60, 107 S.Ct. at 2881–82.[1] In *McNally*, Gray, a former public official of the Commonwealth of Kentucky, McNally, a private individual, and Hunt, the former chairman of Kentucky's Democratic Party, were charged with violations of § 1341 under the good government theory. Hunt gained *"de facto"* control over choosing from whom the Commonwealth would purchase its insurance policies when a Democrat was elected Governor of Kentucky in 1974. *Id.* at 352–53, 107 S.Ct. at 2877–78. Hunt agreed with one Wombwell Insurance Company ("Wombwell") that it could act as Ken-

tucky's agent for securing insurance policies if Wombwell would share commissions exceeding $50,000 with other agencies that Hunt specified. One such "other" insurance agency was controlled by Hunt and Gray and operated by McNally. Hunt, Gray and McNally were charged with mail fraud, and Hunt pled guilty. *Id.* at 353, 107 S.Ct. at 2878. At trial, the government proceeded against Gray and McNally on the basis of a mail fraud count concerning a commission check that one of the "other" insurance companies had mailed to Wombwell. *Id.* This count alleged that Gray and McNally had deprived the citizens and government of Kentucky to their right of good government and that they had devised a scheme to obtain money and valuable property by means of false pretenses. *Id.* The district court, however, instructed the jury only with regard to the "good government" theory because the court found that the "scheme to obtain money and property" theory was subsumed in the good government theory. *Id.* at 354 note 3, 107 S.Ct. at 2878 note 3. Gray and McNally were convicted of mail fraud, and the Sixth Circuit confirmed their convictions on appeal.

Writing for the majority, Justice White observed that although the mail fraud statute clearly protects property rights, it is silent with respect to the intangible right of good government. *Id.* at 356, 107 S.Ct. at 2879. The Court noted that "the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *Id.* Justice White focused on the phrase "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses" in an effort to determine whether amendments to the original statute were meant to depart from this original impetus. He observed that the phrase "or for obtaining money or property by means of false or fraudulent

---

1. In *McNally* the United States alleged that the defendants had schemed to defraud the citizens and government of the Commonwealth of Kentucky of certain "intangible rights", among which was the right to have the Common-

wealth's affairs conducted honestly. *McNally,* 483 U.S. at 352, 107 S.Ct. at 2877. This Court refers herein to such charges as being based upon the "good government" theory.

pretenses, representations, or promises" had been added by Congress in 1909 after the Supreme Court's decision in *Durland v. United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896). In *Durland*, the Supreme Court held that the mail fraud statute encompassed "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *Durland*, 161 U.S. at 313, 16 S.Ct. at 511.

Justice White concluded in *McNally* that Congress did not seek through the 1909 amendment to depart from the common understanding of the words "to defraud", which commonly refer "to wronging one in his property rights by dishonest methods or schemes," and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *McNally*, 483 U.S. at 358–59, 107 S.Ct. at 2881, quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). Rather, the 1909 amendment merely codified the Court's holding in *Durland* and made it clear that, unlike the common law definition of fraud, the statute also encompassed representations with regard to the future. Instead of quoting the Court's "everything designed to defraud" language, however, Congress had employed the phrase "[any scheme or artifice] for obtaining money or property." *McNally*, 483 U.S. at 357–58, 107 S.Ct. at 2880–81. Although Congress separated the "scheme or artifice to defraud" phrase from the "for obtaining money or property" phrase with the disjunctive "or", Justice White concluded that the two phrases were not meant to be construed independently. *Id.* at 364–65, 107 S.Ct. at 2884. The 1909 amendment was but a clarification, and it did not signal a departure from the aforementioned "common understanding" of the words "to defraud".

In light of this understanding of the mail fraud statute, the majority held that nothing in the mail fraud instruction to the jury required the jury to find the kind of property deprivation that would permit Gray's and McNally's convictions to stand. *Id.* at 361, 107 S.Ct. at 2882. Justice White noted that Gray and McNally's share of the com-

missions were not the Commonwealth's money and that the government did not allege that but for the scheme, Kentucky would have paid lower premiums or secured better insurance. *Id.* at 360, 107 S.Ct. at 2881. Justice White also observed that the jury instruction did not suggest that the Commonwealth had been deprived of control over its pursestrings, and he emphasized that some agency would have been paid an insurance premium and that McNally and Gray had only asserted control over commissions that the Commonwealth might not have otherwise asserted. *Id.* Finally, the majority concluded that although the government argued to the Court that McNally and Gray obtained property by means of false pretenses, the government could not rely on such an assertion on appeal, because the jury charge did not include the "false pretenses" theory. *Id.*

Following its decision in *McNally*, the Supreme Court ruled in *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), that both tangible and *intangible* property fall within the scope of the mail and wire fraud statutes. In *Carpenter*, the Supreme Court considered whether the Wall Street Journal's interest in prepublication confidentiality for a newspaper column was a property right protected by the mail fraud statute under *McNally*. The Journal column provided information on selected stocks and offered the authors' opinions regarding the investment potential of the stock or stocks featured. *Id.* at 22, 108 S.Ct. at 318. Because the information contained in the column was found to have some impact on the stock market, it was the Journal's policy and practice to maintain the contents of the column as confidential prior to publication. *Id.* at 22–23, 108 S.Ct. at 318–319. Writing for the *Carpenter* majority, Justice White noted that the deprivation which the Commonwealth of Kentucky had suffered in *McNally*, the contractual right to honest and faithful service, was "an interest too ethereal in itself to fall within the protection of the mail fraud statute." *Id.* at 25, 108 S.Ct. at 320. By contrast Justice

White found that the object of the scheme in *Carpenter* was to deprive the Journal of confidential business information, which "has long been recognized as property." *Id.* at 25–26, 108 S.Ct. at 320–321. He also noted that the Court had previously recognized that news matter is "stock in trade", which is gathered, distributed and sold for money like "any other merchandise". *Id.* at 26, 108 S.Ct. at 321 quoting *International News Service v. Associated Press,* 248 U.S. 215, 236, 39 S.Ct. 68, 71, 63 L.Ed. 211 (1918). Thus, Justice White concluded, although the Journal's interest in prepublication confidentiality was "intangible", it was, nonetheless, "property" for the purposes of the mail fraud statute. *Id.* He further noted that the fact that the Journal had not been deprived of the first public use of the information did not foreclose the applicability of the mail fraud statute. Rather, Justice White concluded that it was sufficient that the Journal was deprived of its right to exclusive use of the information, "for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id.*

## ALLEGED PROPERTY RIGHTS OF THE STATE & SCHOOL DISTRICT

In the case at bar the government alleges that the school district and the state were deprived of both tangible and intangible property interests. The intangible property allegedly involved in defendant's "scheme" was:

(1) the district's exclusive control over distributing a limited number of jobs;

(2) the district's exclusive control over how its money was spent;

(3) the district's exclusive control over who it hires to chauffeur its children;

(4) the district's exclusive control over its own tortious liability;

(5) the district's exclusive control over the type of persons with whom it chooses to contract for employment;

(6) the state's exclusive control over allocation of resources for processing bus permits;

(7) the state's exclusive control over distribution of bus operator's permits.

The tangible property allegedly involved in defendant's "scheme" was:

(1) the wages that the district paid to defendant;

(2) the state's expenses in processing defendant's fraudulent permit application;

(3) the physical piece of paper upon which the permit was printed.

The Court must first determine whether the intangible interests set forth in the indictment constitute "property" under *McNally* and *Carpenter.* After making this determination, the Court will then resolve the question of whether the indictment alleges a property deprivation under the mail fraud statute consistent with *McNally.*

### Intangible Property

The government characterizes its proposed seven intangible property rights as examples of the "intangible right to control resources." It argues that the Supreme Court clearly stated in *Carpenter* that the mail fraud statute encompasses both tangible and intangible property rights and specifically recognized the right to control the use of resources as a cognizable property right. Thus, the government argues, because the indictment alleges that the state and school district were deprived of exclusive control over the various interests asserted, it sufficiently alleges violations of the mail fraud statute.

This Court does not dispute that *Carpenter* clearly expresses that intangible property rights come within the protection of the mail fraud statute. What is important for the purposes of the case at bar, however, is defining the *type* of intangible right that rises to the level of "property" under the mail fraud statute. Both *McNally* and *Carpenter* involved intangible rights. In *McNally,* however, the right to good government did not rise to the level of "property", while the right to exclusive control of confidential business information in *Carpenter* did qualify as property. In *Carpenter,* Justice White explained that the two interests were different in that, while the right to good government was

"too ethereal" to rise to the level of property, confidential business information has long been recognized as property. Furthermore, the majority in *Carpenter* emphasized that the particular information, "news matter" is "stock in trade" which can be bargained for and sold like any other commodity. Once the majority had concluded that confidential news matter is property, it could then determine whether the Journal had been deprived of the property. Although the defendants actions did not preclude the Journal from making use of its property, Justice White nevertheless found that the Journal had been deprived of an important right that accompanied the property: exclusive use.

■ This Court believes that the focus of the Supreme Court in *Carpenter* was upon how well established an interest is as a property right (has the interest traditionally been viewed as "property"?). In addition, this Court derives from *Carpenter* that it must look to the value of the interest in the marketplace. This involves inquiring not only whether the asserted interest enjoys some ascertainable value, but also whether it is capable of being marketed, and whether the interest is a commodity that is generally exchanged for value in the open market. Only after the alleged interest has been found to qualify as "property" does the concern for exclusivity of use arise.

■ The majority of interests that the government holds out in the case at bar as "property" have not traditionally enjoyed such status. Rather, most of the interests set forth in the indictment relate to the desire of the state and the school district to exert some measure of control over their respective affairs. The school district's interests in controlling job distribution, who it hires to chauffeur its children, tortious liability and the type of persons with whom it contracts for employment are not tied to any interest that rises to the status of "property". Rather, they express only a desire for control over their general affairs; indeed, they seem to express a desire for control alone.[2] As the Court notes above, however, the interest in control must be focused upon some corresponding property right. Nothing in *Carpenter* suggests that control is in and of itself a property interest. The Supreme Court in *Carpenter* found that a property holder usually has a recognizable interest in the exclusive use of his property and, in the case of the property in question in *Carpenter*, a right to decide how the property was used. Of the "deprivations of intangible property" alleged in the case at bar, only three couple a desire for control with an interest that could even remotely qualify as "property": (1) the state's interests in controlling the distribution of permits and (2) the allocation of resources for processing permits; and (3) the district's interest in controlling how its money was spent. The Court finds that the remaining intangible interests alleged in the indictment are "too ethereal" to warrant the protection of the mail fraud statute.

■ The state asserts an interest in controlling the distribution of bus operator's permits. The state, however, enjoys no property interest in licenses. Rather, because a license has no value except to the licensee, *see United States v. Murphy*, 836 F.2d 248 (6th Cir.1988); *United States v. Ferrara*, 701 F.Supp. 39 (E.D.N.Y.1988), *aff'd*, 868 F.2d 1268 (2nd Cir.1988), the state, in reality, is asserting an interest in controlling the property of another. Thus, the state's interest in licenses is purely regulatory. *Ferrara*, 701 F.Supp. at 42. If the state has no proprietary interest in bus operator's permits, then it can have no property right in controlling their distribution.

■ This leaves only the district's interest in control over how its money was spent and the state's interest in control over the allocation of resources for processing as property interests that could possibly rise to the status of "property". Certainly the state and school district have

---

**2.** In fact, these alleged interests all relate to the school district's desire to control who it hires, which the Court discusses below.

cognizable property interests in their financial resources; money is property in the most traditional sense. In the context of alleged deprivations of intangible property, however, the government does not suggest that the state and school district were deprived of money. Rather, the indictment alleges that the school district and state were deprived of their interests in exclusive control of their money and resources.

With respect to the state's interest in controlling the allocation of resources for processing permits, this Court is influenced by the Supreme Court's emphasis in *McNally* that the jury was not charged that it must find that the Commonwealth was deprived of control over how its money was spent and that, at any rate, "the premium for insurance would have been paid to some agency." *McNally*, 483 U.S. at 360, 107 S.Ct. at 2881. In this statement the Supreme Court recognized that the Commonwealth could not have been said to have been deprived of control over how the money was spent when the money would have been spent for the same purpose absent the fraud. In the case at bar, the state had allocated resources for the purpose of processing bus operator's permits long before defendant submitted his application. It would be absurd to suggest that the Department of Revenue had expended special resources to process this single permit.[3] On the contrary, the administrative machinery was already in place. Processing this single permit did not deprive the state of its control over the allocation of resources.

With respect to the school district's interest in control over how its money was spent, this Court likewise concludes that defendant's alleged scheme could not have deprived the school district of property. Again, the aforementioned statement from

*McNally* is significant. The school district certainly must have allocated a certain amount of money for the purpose of paying bus drivers. The school district could not have been forced to change the manner in which it allocated money, nor could defendant's actions have been aimed at altering this control because the money had already been allocated—the control asserted. The district does not, in fact, object to how its money was spent. They wanted a bus driver, and that is precisely what they got. The district objects to *who* they got. In this respect, the government's theory of liability resembles the good government theory, which the Supreme Court rejected in *McNally*. The school district is not a bank, which "sells" money like any other property and whose success in business depends upon determining who is a good credit risk. *See United States v. Lytle*, 677 F.Supp. 1370 (N.D.Ill 1988) (Indictment charging bank officer with approving loans in violation of band's lending policies states a property deprivation under the mail fraud statute). The school district cannot be said to have a legitimate property interest in who ultimately gets its money. This Court concludes that to find that the school district enjoyed a cognizable property right in controlling what type of person it paid wages would stand *McNally* on its head. The district enjoys no such property right.

*Tangible Property*

■ Of the three remaining property interests—wages, processing expenses and the piece of paper—only one even merits consideration as satisfying the property requirements of the mail fraud statute. Clearly the state's processing expenses do not fall within the clear language of the statute or the realm of property recognized by *McNally*. Defendant certainly did not "obtain", nor does the government suggest

---

**3.** In the context of the government's "allocation of resources" argument, this Court must note that a significant difference exists between the state's alleged deprivation of control over allocation of resources and alleged deprivation of resources. When the state claims that it was deprived of control over allocation of resources, it is claiming that defendant interfered with the state's power to designate the purpose to which its funds would be devoted. The state is not alleging in its deprivation of control argument that it was deprived of the actual funds. Indeed, the state makes a separate argument with respect to a deprivation of the actual resources. Thus, the Court addresses in this section the effect of defendant's alleged misrepresentations on the state's power to earmark funds. The Court discusses below whether the defendant's alleged misrepresentations resulted in a deprivation of resources to the state.

that defendant sought to "obtain", the state's processing expenses. The government does argue that the defendant "deprived" the state of these expenses in that had defendant truthfully completed his application, the application would never have been forwarded to the Department of Revenue. The government fails, however, to suggest an amount representing the expenses incurred by the state or even that the cost incurred by a government agency in processing a single application of this sort is susceptible of calculation. Rather, the government simply postulates that the cost must exist. This Court cannot conclude that the effort exerted by the Missouri Department of Revenue in processing a single application for a bus operator's permit in the regular course of business has any measurable value for the purposes of qualifying as "property" meriting the protection of the mail fraud statute. Likewise, the government's claim that the state enjoyed any appreciable property interest in the piece of paper upon which defendant's license was printed is patently absurd. Even the mail fraud statute must have some "de minimus" limitation in its reach!

■ Thus, the only peg left upon which the government may hang a violation of the mail fraud statute is the school district's interest in the wages paid to defendant. It is irrefutable that the school district suffered no financial injury. The school district paid wages for the services

of a bus driver; defendant provided these services. The government's position, however, is that *Carpenter* states that no financial detriment is necessary for a scheme to defraud to exist and that no actual or potential deprivation of property is necessary under the mail fraud statute when the indictment alleges that money or property was obtained "by means of false or fraudulent pretenses". This Court finds, for the reasons set forth below, that unless the school district was actually deprived of the wages paid to defendant or suffered the loss of some important right appurtenant thereto, the government cannot allege a violation of the mail fraud statute.

As the Court notes above, the Supreme Court observed in *McNally* that the mail fraud statute was originally enacted to protect people "from schemes to deprive them of their money or property." Justice White found that Congress' 1909 addition of the phrase "or for obtaining money or property by means of false or fraudulent pretenses" did not mark a departure from the "common understanding" of the words "to defraud". Rather, the 1909 amendment simply clarified that the the scope of "scheme or artifice to defraud" extended to promises as to the future as well as representations regarding the past or present. Thus, the Supreme Court found that the 1909 amendment and the original "scheme to defraud" phrase are not independent theories under which a violation of the mail fraud statute may be alleged.[4] Therefore,

4. The government has cited cases, *United States v. Thomas*, 686 F.Supp. 1078 (M.D.Pa.1988); *United States v. Cooper*, 677 F.Supp. 778 (D.Del. 1988), which suggest that no deprivation of property is necessary when an indictment alleges that property was obtained through "false or fraudulent pretenses". These cases place great emphasis on Justice White's observation in *McNally* that the government could not assert that Gray and McNally had obtained property by false pretenses on appeal, because the jury instruction by the district court did not include an "obtaining money or property by means of false or fraudulent pretenses" charge. *Thomas*, 686 F.Supp. at 1084–85; *Cooper*, 677 F.Supp. at 781. These district courts rely on this reference in *McNally* to support the theory that the mail fraud statute does not require a deprivation of property when the government alleges that property has been obtained "by means of false

or fraudulent pretenses." *Thomas*, 686 F.Supp. at 1084–85; *Cooper*, 677 F.Supp. at 780–81. Courts adopting this theory conclude that Justice White's reference to what the jury charge did *not* contain suggests that the inclusion of a "false pretenses" instruction would have led the *McNally* Court to a different result.

This Court concludes, however, that Justice White's reference in *McNally* to "false pretenses" is, at best, dicta. Justice White's reference only indicates that the "false pretenses" argument was not properly before the Court and that the Court would not address the issue at that time. Whether the Supreme Court would have reached a different result had it been faced with a "false pretenses" instruction is a question inviting speculation, and this Court will not speculate. Rather, the rationale underlying the Supreme Court's decision of the issue before it in

any violation of the mail fraud statute must involve a "scheme to defraud". In addition, because the "common understanding" of "to defraud" remains intact, any violation of the mail fraud statute must involve a "deprivation of something of value" and "wrongdoing" with respect to an individual's property rights. *Carpenter* further elucidates the scope of the mail fraud statute by recognizing that property need not be tangible and that an individual need not be deprived of the property itself in order for a deprivation of something of value to exist. In Carpenter, although the Journal suffered no financial loss and although the defendants had not effectively barred the Journal from using its property, the defendants had deprived the Journal of an important right that was part and parcel of the property: the right to exclusive use.

To summarize, this Court concludes that *McNally* and *Carpenter* stand for the proposition that a deprivation of property or an important right appurtenant thereto is required under the mail fraud statute. The property in question need not be tangible, but if it is not tangible, it must at least be an intangible right or interest that is traditionally recognized as property. Furthermore, the victim need not be deprived of the property itself or suffer financial loss. If the property itself is not lost, however, there must at least be some deprivation of an important right that accompanies the property, whereby the property holder's use and enjoyment of the property is diminished.

In the case at bar, the government makes no allegation that suggests that the school district was "deprived" of the wages paid to defendant. The government does not suggest that defendant did not perform the service of driving a bus for Normandy School District in return for the wages he received. Nor does the government suggest that defendant was so poorly qualified to perform the service of driving school buses that the district somehow received less than it paid for. Rather, the government's claim is that the school district did not expect to pay wages to a convicted felon. In this respect, the government is simply realleging its interest in how its money was spent,[5] which this Court has already found not to be a cognizable property interest within the meaning of *McNally* and *Carpenter*. Hence, this Court concludes that the indictment alleges no property deprivation under *McNally* and *Carpenter* and that it, therefore, fails to allege a violation of the mail fraud statute.

In summary, this Court believes that to prosecute a defendant for violations of the mail fraud statute under the facts of this case would be a misapplication of federal law. It is likely that suits of this kind led to the Supreme Court's decision in *McNally!* If defendant's single act of lying on his bus driver's application under the circumstances of this case gives rise to a mail fraud violation, then almost every false statement in every application that is mailed or expected to be mailed would do likewise. For example, any misrepresentation in an application for a house or car loan, or any misrepresentation in any application for employment, no matter how insignificant, would similarly invoke federal prosecution under the mail fraud statutes. This Court, following the Supreme Court in *McNally*, deems such overreaching to be a misuse of the mail fraud statute. The State of Missouri provides adequate protection for its citizenry in statutes that are clearly applicable to the case at bar.[6] It is

---

*McNally* provides an adequate basis for this Court's decision in the case at bar.

**5.** The Court notes that the majority of the indictment's alleged property deprivations are the same complaint phrased in different terms: the state and school district did not desire to pay wages to a convicted felon. The language of the indictment is telling in this respect: "who it hires to drive its children"; control over hiring a "First Degree Murderer" to drive its children;

control over the "type of persons" with whom it chooses to enter contractual relationships.

**6.** Section 302.230 of Missouri's Revised Statutes provides:
Any person who makes a false unsworn statement or affidavit or knowingly swears or affirms falsely as to any matter or thing required by sections 302.010 to 302.340 shall be deemed guilty of a misdemeanor and punishable only by a fine. No person found guilty of making a false statement or affidavit shall be licensed to

to these statutes that the officials of the State of Missouri should turn.[7]

The defendant's motion to dismiss the indictment will be granted and the indictment dismissed.

operate a motor vehicle for a period of one year after such a finding or conviction. Mo.Rev.Stat. § 302.230 (1986). Section 302.272 Mo.Rev.Stat. denies school bus operator's permits to applicants who have been convicted of certain felonies.

7. If the purpose of the indictment in this case is to harass defendant as a convicted murderer, then, again, the state statutes would seem to be the appropriate means. If the facts in this case call for mail fraud application, then there is no end to just how far mail fraud can be stretched.